KILPATRICK et al. v. WILEY et al., Appellants.

Division One, June 19, 1906.

1. **FRAUD: Proof.** Fraud need not be proved by direct testimony. It may be shown by the proof of facts from which it may be naturally and reasonably inferred. But it must still be proved; it may not stand upon a fog of suspicion, or be based on mere conjecture.

2. ——: ——: **Presumption of Honesty.** The law indulges the presumption of good motives. When an act may as fairly be attributed to a proper, as to a bad, motive, the proper motive is presumed to exist.

3. ——: **Principal and Agent:** **Delegation** **of Power: Sale of**
**Land: Contract Revealing Agent as Vendor.** An agent au-
thorized by a power of attorney to sell land cannot delegate to
his employee, without an existing power of substitution, au-
thority to draw up with the vendee a contract naming the
agent as the vendor. And if such employee in the agent's
name draws up and procures to be signed by the vendee such
a contract, it is no sign of fraud, but meet and reasonable, that
the agent should put the contract in legal form, that is, in a
form his principal the vendor could readily enforce, and have
it re-executed by the vendee.

4. ——: ——: ——: ——: ——: **Record: Conspiracy:**
**Damages.** The record of a contract for the sale of land is in
contemplation of law a muniment of title. And so where the
contract for sale of land named the agent as seller, and he, on
discovering the mistake, had one drawn up which named the
vendors as the sellers and owners of the land, and them by him
as their agent as parties of the first part, and acknowledged
it as their agent, and secured the execution and acknowledg-
ment thereof by the vendees, and put it of record, no in-
ference of fraud or of a conspiracy to defraud can be inferred
from his acts or from his and the vendees' acts, if he had legal
authority to make a binding contract. Neither can any dam-
age flow to the vendors because they were prevented by the
record of the contract to sell at a better price, if the agent had
authority to make the contract.

5. **PRINCIPAL AND AGENT: Authority to Sell: Burden.** The
burden is on the purchaser of land who seeks specific perfor-
mance of the contract of sale, and on the agent who seeks to re-
cover his commissions for making the sale, to show that the
agent had proper legal authority from the vendor to make the
sale and to enter into a contract of sale in the vendor's name.

6. **SPECIFIC PERFORMANCE: Spoliation of Contract: Not Is-**
**sue at Trial.** Where neither by the pleadings nor by the proof
the point was made at the trial that the agent's power of at-
torney to sell, which is the basis of the vendee's right to com-
pel specific performance, was spoliated by the erasure of some
figure and the substitution of another, a finding by the chancel-
lor that the power had been altered cannot stand. The find-
ings should be responsive to the issues and proof. And where
such issue was not pleaded, and was not covered by the proof,
the decree based on a finding that there had been a spoliation
is without legal basis.

7. ——: ——: **Erasures and Interlineations: Presumption.** Era-
sures and interlineations are but ordinary incidents in the gen-
esis of contracts. Of themselves, without indicia of spoliation or

fraudulent intent, they amount to nothing. And in the absence of proof to the contrary, are presumed to have been made prior to the execution of the contract.

8. ———: **Evidence: Oral and Documentary: Deference to Chancellor.** The appellate court will defer somewhat to the findings of the chancellor in an equity suit in so far as the issues depend on oral testimony. But the rule is not so broad as to documentary evidence. In either case, it is the duty of the appellate court to supervise the decree, to reconsider the record facts and to see that equity is done.

9. ———: **Establishing Contract: Execution: Defenses: Burden.** The burden is on the vendee asking for specific performance of a contract of sale of land entered into by the vendor's agent in the vendor's name, to show the execution of the agent's power of attorney to sell, but having done that the burden shifts to the vendor to show that, by accident, fraud or mutual mistake, a material part of the agreement was omitted from the power signed by him, if his defense is that the power he signed contained more land than was called for by the contract the agent made with the vendee.

10. ———: ———: **Preliminary Talk.** The presumption is that all preliminary oral talks as to the terms of sale were finally merged in the written contract authorizing the agent to sell.

11. ———: ———: **Defeating Contract: Omission of Vital Provision: Character of Proof.** To establish the fact that a material and vital provision of a written contract, executed by the vendor and authorizing an agent to sell land, was omitted therefrom, namely, that the contract the vendor signed called for 1220 acres of land whereas the one in suit calls for only 480 acres, and to go further and show that such material and vital provision was violated, and that by such violation the contract was avoided, in that only 480 and not the whole 1220 acres were sold, requires on the part of the vendor cogent, clear, unequivocal and convincing proof, even in a suit for specific performance. On principle, the same general satisfactory character of evidence to prove such facts should be produced by him as would be required in a court of equity to reform the contract by supplying such omission.

12. ———: ———: **Authority of Agent to Sell: Facts in Evidence.** In a suit by the vendees for specific performance of a contract to purchase 480 acres of land, the vendees produced two powers of attorney, the one authorizing the vendors' agent to sell 480 acres of uphill land, the other 740 acres of bottom land, and claimed that they had purchased from the agent the uphill lands and produced a written contract entered into by the agent in

the vendors' name with them, and prayed for specific perform-
ance of that contract. The vendors would neither admit nor de-
ny the execution of the powers, but stated they signed but one
contract and that that called for all the land. They did not
plant their defense on the proposition that the powers had not
been executed by them, but upon the proposition that, by acci-
dent, fraud or mutual mistake, a beneficial and vital provision
had been omitted from the one they signed. There was no such
defense pleaded, nor was there any evidence directed to that
precise contention. The agent's employee who procured and
wrote the powers, testified that the vendors read them over and
executed them in his presence after the matter of embracing all
the land in one sale had been thoroughly talked over and
understood. Both powers consisted of small pieces of card
board, of the same size, the printed matter in each being the
same. In the one which is the basis of the suit, the vendors
agree to accept $40 an acre for the land, not less than $2,000
cash, and not to price the land at less than $45 an acre to any
one furnished by the agent. In the other, they agree to accept
$19 an acre for a part of the land, $25 an acre for the balance,
not less than $1,000 cash if either tract is sold, and not less
than $2,000 if both tracts are sold, and not to price either tract
for less than $25 per acre to any person furnished by the agent.
*Held*, first, that the agent's authority to sell the uphill and bot-
tom lands separately was established by the testimony; and,
*second*, the internal evidence furnished by the powers them-
selves shows that separate sales were contemplated.

13. ———: ———: ———: **Unwritten Understanding.** A vendee
is put upon inquiry as to the power of the vendor's agent to
sell, but he is not bound by any unwritten wishes expressed
to the agent by the vendor. What third persons are interested
in is the agent's authority as expressed in the formal written
power.

14. ———: **Agent's Authority: Revocation: Power and Right.** The
principal's power and right to revoke at any time the agent's
unexecuted power of attorney, not coupled with an interest,
cannot be questioned by third parties; but as to the agent,
the principal's power of revocation is one thing, and his right
to revoke, in breach of the terms of the contract, is another.
But, in any case, revocation is affirmative matter, and the bur-
den is on the party relying on it.

15. ———: ———: ———: **Not Pleaded: Assumed.** An allegation
that the agent's contract of sale was made without authority,
is not an averment that the agent's authority was revoked, for
revocation assumes authority once existed. In the absence of
such averment, it is questionable whether the issue of revoca-
tion can properly get into the case.

16. ———: ———: ———: **What Amounts to Revocation: Neces-
sary Implication.** A power to sell may be revoked by a sale
of the subject-matter by the donor, by a sale by another agent,
by death, by express revocation, or by the performance of some
act resulting in its revocation by necessary implication.

17. ———: ———: ———: **Notice.** Under given circumstances,
notice of revocation to third parties dealing with the agent is
necessary. Likewise, under given circumstances, notice to the
agent himself is necessary.

18. ———: ———: ———: ———: **This Case: No Revocation.** The
owners of land gave a written power to an agent, through his
employee, to sell the land, and made the power irrevocable for
six months. Within that time the employee sold the land, and
entered into a written contract with the purchasers, which
named the agent as seller. This contract was immediately
forwarded to the agent, who on the same day drew up a con-
tract naming the owners as sellers, executed and acknowledged
it as the sellers' agent, sent it to the purchasers who three
days later executed and acknowledged it, and it was recorded.
This contract the owners seek to have set aside, as having
been made without authority in the agent to make it, in that
the owners had revoked the agent's power before it was made.
On the same day the land was sold the agent's employee went
to see the owners, tendered them the advance payment, and
asked for a consummation of the transaction. The owners re-
fused, stating at first that they had made some improvements
on the land which must be paid for, that they had been offered
more money, and that the wife of one of them would not sign
the deed, and not till two weeks later did they make the objec-
tion that the agent's power authorized him to sell more land,
and that he had not sold it all—the ground relied on at the
trial. They never notified the purchasers of any revocation of
the agent's authority, and made no effort or inquiries looking
to a notification to or identification of the purchasers, nor did
they notify the agent of a revocation of his authority. *Held*,
that, conceding, without deciding, that, under the circumstances,
mere notice to the agent's employee was notice to the agent
(a questionable proposition), on no theory of the law was there
a revocation of the agent's power by the owners.

19. ———: **Agent Exceeding Authority: Substantial Compliance.**
To the extent that the power of the agent authorized to sell
is expressed, it is exclusive of every other main power. A sub-
stantial variance will defeat both the agent's right to compen-
sation, and will avoid the contract made by the agent for his
principal with a third party. But a substantial compliance
meets the requirements of equity in specific performance. The
object of the parties is to be kept in view, and, when the lan-

guage used will permit, the construction should be adopted which will carry out, rather than defeat, the purpose of the power. For this reason, the grant of authority must be construed to include all medium powers which are necessary to the effective execution of the authority granted.

20. ———: ———: ———: **Power to Sell and Contract.** The owner of land in writing authorized the agent "to sell the following described real estate, and to make contract therefor in my name, subject to the conditions hereinafter named." *Held*, that, the body of the contract having not been set forth in the power, the agent had authority to insert in the contract he made with the purchasers all usual and reasonable terms and provisions to accomplish the object aimed at.

21. ———: ———: **Raised for First Time On Appeal.** To a suit by the vendor to cancel a contract entered into by his agent, on the ground that it was made without authority, the purchaser answered, averring the validity of the contract and praying for specific performance. Losing in the court below, the purchaser appeals, and here, for the first time, is met with an objection that the contract was in excess of the agent's authority. *Held*, that, in appellate courts the cause will be reheard on the same theory it was heard below, and even in a suit for specific performance, adjudicated by a court of equity, a respondent will not be heard to contend for the first time on appeal that the contract relied on by appellant cannot be enforced because it included provisions which the agent was not authorized to insert therein.

22. ———: **Contracts: To Be Enforced.** Courts of equity do not sit to forfeit, but to enforce contracts, fair and just. Where there is an absence of overreaching conduct, surprise, artifice or other form of fraud and imposition, and of accident or mutual mistake, the contract should be specifically enforced.

23. ———: **Terms.** The terms upon which specific performance of a contract to sell land may be decreed are set forth in the opinion—title, rental value, inchoate dower, tender, interest, taxes and insurance, and damages for loss of bargain, being considered.

Appeal from Chariton Circuit Court.—*Hon Jno. P. Butler*, Judge.

REVERSED AND REMANDED (*with directions*).

*Ed. E. Yates* and *Perry S. Rader* for appellants.

(1) The court erred in finding as a fact that the figures "$40" mentioned in the contract denominated Exhibit A, made by Kilpatrick and Lisle with Allen for the sale of their land, had been changed. The court had no authority or right to consider that matter. The alteration of the contract in that regard was not in anywise brought in question by any party to the suit nor was there any evidence whatever on that point. Even an equity court has no right to raise and decide a question in no wise brought in issue by either party, and concerning which there was absolutely no evidence except the face of the instrument itself. The decree must be authorized both by the facts stated in the petition and by the proof. There was nothing in the pleadings upon which such a finding could have been based. Reed v. Bott, 100 Mo. 67; Newman v. Kenton, 79 Mo. 385; Schneider v. Patton, 175 Mo. 723; Newman v. Trust Co., 189 Mo. 423; Needles v. Ford, 167 Mo. 496; Story v. Story, 188 Mo. 110. (2) If there was any alteration or change in the figures "40" in that contract, the presumption, in the absence of any showing to the contrary, is that it was made before execution, and was therefore approved by the parties. Stillwell v. Patton, 108 Mo. 360; McCormick v. Fitzmorris, 39 Mo. 33; Burnett v. McCluey, 78 Mo. 676; Paramore v. Lindsey, 63 Mo. 63; Land & Lumber Co. v. Moss Tie Co., 87 Mo. App. 167. Besides, Englehart testified that both Exhibits A and B were at the trial just as they were when plaintiffs signed them, and that they had not in anywise been changed, and his testimony was not contradicted by any witness. (3) There was not a particle of evidence either pro or con to support the court's finding that "plaintiffs testified that under the arrangement made at the time, all their lands were to be sold or none for the average price of $30 per acre."

They did not so testify.  They did not testify that the
lands were to be sold at an average price of $30 an
acre.  Unquestionably the court's finding that they had
so testified, in connection with its further finding that
the figures $40 had been changed, had much to do with
the chancellor's finding that the plaintiffs and Engle-
hart made only one contract; that neither Exhibit A
nor Exhibit B was the contract they made, but that the
only one they made included all the lands.  Without
those findings, the decree is illogical, inconsistent and
unscientific.  It was illogical and unscientific to find
that plaintiffs had signed the written contract author-
izing Allen to sell the lands, and then, without any find-
ing that their signatures were obtained by fraud or
that the contract was the result of mutual mistake, pro-
ceed to set that contract aside, unless it had been al-
tered after execution.  (4)  The plaintiffs would not say
that they had not signed the contract (Exhibit A) au-
thorizing Allen to sell the 480 3-4 acres in controversy,
although pressed to say whether they had or not.  On
the contrary, they both said at the outset of their cross-
examination that they had signed it and that their
names to that contract was in their handwriting, and
they never did nor would they say that they had not
signed that contract.  Every other witness who testi-
fied on the point unequivocally stated that their names
on the contract were their genuine signatures, and the
court found, as a matter of fact, that both Lisle and
Kilpatrick had signed that contract, and no other con-
clusion can be reached when the testimony is properly
considered.  That being the case (that they did sign
it), the contract can be avoided only by showing that,
as a result of fraud or mistake, the 740 acres of bottom
land was omitted from that contract.  Gann v. Shaw &
Son (Tex.), 2 Willson Civ. Cas. Ct. App., sec. 257;
Beebe v. Swartwout, 8 Ill. (Gilman) 184.  In the ab-
sence of fraud or mutual mistake, neither party to a
contract has the right to rescind it without the assent

of the other. Mfg. Co. v. McCord, 65 Mo. App. 509; Hart v. Handlin, 43 Mo. 171. The signature of Kilpatrick and Lisle creates a presumption of their assent to everything contained in the contract. Robinson v. Jarvis, 25 Mo. App. 421; Campbell v. Van Houten, 44 Mo. App. 231; Gwin v. Waggoner, 98 Mo. 327; Rice v. Mfg. Co., 2 Cush. (56 Mass.) 87. (5) To avoid a contract on the ground of mistake, the mistake must be mutual. Benn v. Pritchett, 163 Mo. 560. It must be shown that both parties understood the matter in the same way. Greditzer v. Ins. Co., 91 Mo. App. 534; Parker v. Vanhoozer, 142 Mo. 621. (6) To cancel or reform a deed or contract on account of mistake, the mistake must be shown by clear and cogent proof, fully satisfying the chancellor. Judson v. Mullinax, 145 Mo. 630; Sweet v. Owens, 109 Mo. 1; Bartlett v. Brown, 121 Mo. 362. (7) There is no claim that the omission of the 740 acres of bottom land from the contract authorizing Allen to sell the 480 3-4 acres in suit was the result of misrepresentations or other fraud of Englehart. Nor was there any evidence which in the slightest degree indicated that plaintiffs' signatures to that contract or power of attorney (Exhibit A) were obtained through fraud. (8) There is nothing in the pleadings upon which a decree canceling and anulling that contract (Exhibit A), on account of misrepresentations or mistake or omission of the bottom land therefrom, could be based. No fraud or mistake in the procuring of that contract was pleaded. The only fraud pleaded was that defendants had wrongfully and maliciously put of record Exhibit D without authority, and thereby cast a cloud upon plaintiffs' title and prevented them from selling the land. "If the pleader identifies the fraud by a specification, he is held to the precise specification pleaded." Story v. Story, 188 Mo. 118; Burnham v. Boyd, 167 Mo. 185; Newman v. Trust Co., 189 Mo. 423. (9) The plaintiffs could not revoke their contract with their agent Allen to sell the land

after he had sold it on June 9, 1902. It was then no longer an executory contract or power, but an executed authority; and frc~n the time the land was sold to Wiley and Dungan, Allen's written authority was not lacking in mutuality and was not revocable. "Of course if the authority has been executed, it cannot be revoked." 1 Am. and Eng. Ency. Law (2 Ed.), 1217. "Where the agency has been fully executed it cannot be revoked, and thereby affect acts or contracts that have been made in compliance with such authority." 1 Clark & Skyles on Law of Agency, p. 406, sec. 167; 1 Story on Agency, secs.465, 466; Green v. Cole, 103 Mo. 78; Glover v. Henderson, 120 Mo. 376; Heman v. Wade, 140 Mo. 340; Hubbard v. Glass Works, 188 Mo. 35. (10) Even if Allen's power to sell the land and enter into the contract therefor (Exhibit D) with Wiley and Dungan, was revoked by plaintiffs' refusal on June 9, when informed that the land had already been sold, to execute deed and carry out their contract with Allen, still that revocation did not affect the validity of the contract recorded on June 16, because not until after June 16 was their refusal to execute the deed made known to Wiley and Dungan, and hence they entered into that contract through plaintiffs' ostensible agent without any notice that plaintiffs had attempted to revoke their agent's authority. 1 Clark & Skyles, Law of Agency, p. 406, sec. 168, and p. 389, sec. 158; Lamote v. Railway & Dock Co., 17 Mo. 204; Fanning v. Cobb, 20 Mo. App. 577; Tiffany on Real Estate Agency, p. 50; Story on Agency, sec. 470; Watson v. Bogaley, 12 Pa. St. 164; Beard v. Kirk, 11 N. H. 397; Mechem on Agency, secs. 209, 210; Tiffany on Agency, pp. 138 and 139; Hatch v. Coddington, 95 U. S. 56; Johnson v. Christian, 128 U. S. 381; Diversy v. Kellogg, 44 Ill. 114; Hancock v. Byrne, 35 Ky. 514; Mastin v. Grimes, 88 Mo. 490; Smith v. Allen, 86 Mo. 178. (11) Authority given an agent to make sale of land includes authority to execute a binding contract for such sale in the name

of the principal. Smith v. Allen, 86 Mo. 178; Keim v. Lindley, 30 Atl. 1073; Jackson v. Dodge, 17 Ill. 433; McNeil v. Shirley, 33 Cal. 202; Haydock v. Stow, 40 N. Y. 363; Stewart v. Wood, 63 Mo. 256; Lyon v. Pullock, 99 U. S. 668; Glass v. Rowe, 103 Mo. 536; Yoder v. White, 75 Mo. App. 155. (12) This contract (Exhibit D) made by Allen for plaintiffs and in their name with Wiley and Dungan, for the sale of the land, dated June 9, 1902, was strictly within the scope of the authority conferred by plaintiffs upon Allen. Smith v. Allen, 86 Mo. 189; Glass v. Rowe, 103 Mo. 537; Mitchner v. Holmes, 117 Mo. 185; Waterman on Spec. Perf., sec. 412; Mastin v. Grimes, 88 Mo. 478; Green v. Ditsch, 143 Mo. 12; Kent v. Allen, 24 Mo. 98; Keim v. Lindley, 30 Atl. 1063; Maupin on Marketable Title, p. 22, sec. 5; Tiffany on Agency, pp. 168, 169, 174; Heemstreet v. Burdick, 90 Ill. 450; Holliday v. Daily, 86 U. S. (19 Wall.) 606; 1 Clark & Skyles, Agency, p. 498. (13) The defendants Wiley and Dungan are entitled to their deed to the land, and, by way of damages, the value of the rents from March 1, 1903, when they were to have possession. If plaintiffs cannot give them a good title they are entitled to six per cent interest on the purchase money ($21,120) from March 1, 1903, to the date of the decree, and to $5,000 for the loss of their bargain. Cook v. Johnson, 3 Mo. 237; Kennedy v. Koopmann, 166 Mo. 87; Harrison v. Craven, 188 Mo. 610. (14) Allen is entitled to his commission. 1 Warvelle on Vendors (2 Ed.), sec. 228, p. 278; Nesbit v. Helser, 49 Mo. 384; Bailey v. Chapman, 41 Mo. 536; Woods v. Stephens, 46 Mo. 556; Gelatt v. Ridge, 117 Mo. 553. (15) All property rights depend upon contracts. 1 Parsons on Contracts, p. 3. The right to bring a suit to enforce a contract is part and parcel of that contract and one of the essential attributes of property, of which the owner can not be deprived if the organic law of both State and Nation be observrved. In re Flukes, 157 Mo. 131. "When the party by his own contract

creates a charge or duty upon himself, he is bound to make it good." Heman v. Wade, 140 Mo. 340; Davis's Admr. v. Smith & Bradley, 15 Mo. 469; Shouse v. Neiswaanger, 18 Mo. App. 250; Hall v. School District, 24 Mo. App. 217; Brinkenhoff v. Elliott, 43 Mo. App. 193; Beatie v. Coal Co., 56 Mo. App. 230.

*C. B. Crawley, Crawley & West* and *J. A. Collet* for respondents.

(1) Defendants Wiley and Dungan as well also as Allen, in their answer to plaintiffs' petition pleaded the contract between Allen and Lisle and Kilpatrick, which is denominated Exhibit A, according to its legal effect, as was proper to do, and plaintiffs replied to the answer, denying every allegation of new matter therein contained. The pleadings in this form properly put in issue the question of whether or not any contract had been entered into and was in effect at the time Allen undertook to make the contract with Wiley and Dungan, which would authorize Allen to sell the land at the price and upon the terms of sale attempted to be made by him to Wiley and Dungan. Bliss on Code Pleading, secs. 206, 207; Reilly v. Cullen, 159 Mo. 322; Anderson v. Gaines, 156 Mo. 664; Estes v. Shoe Co., 155 Mo. 577. (2) The positive denial of Kilpatrick and Lisle that they had executed any contract or authority to sell, authorizing Allen to sell the 480 3-4 acres separate and apart from the bottom land, and the claim of Allen that Exhibit A was executed by plaintiffs in its present form, clearly and fairly put the integrity of that paper in issue, and the paper itself being in evidence and showing upon its face that the $40 indicating the price at which the land was listed for sale was a substitution for some other figures previously made in that place and for that purpose, and the fact that all parties admitted that about 740 acres of other land was listed for sale at the same time that

this was, and the positive denial of Kilpatrick and Lisle that they signed but one contract with Allen's agent, and the testimony of F. M. Lewis that he was present at the signing of the contract between the parties and saw only one paper, was certainly sufficient evidence from which could properly be found all the facts found by the court in this case, and the court's finding being supported by substantial evidence, this court will not disturb it. Rea v. Ferguson, 72 Mo. 225; Anderson v. Griffith, 86 Mo. 549; Warder-Bushnell-Glesser Co. v. Allen, 63 Mo. App. 456. (3) Plaintiffs are not asking for the reformation of the contract entered into with Allen, under which defendants claim Allen had authority to make the contract in plaintiffs' name with Wiley and Dungan. They had no notice from the pleadings that the contract relied upon by defendants was different from the contract actually entered into between Allen and plaintiffs—a contract for the sale of plaintiff's land, about 1220 acres—and knowing that such a contract was the only one ever executed by them authorizing Allen to sell land for them, they had a right to assume that the contract referred to in defendants' answer was the contract to sell 1220 acres, and their reply was sufficient to put in issue Allen's authority to sell under that contract. Bliss on Code Pleading, secs. 206, 207. (4) Defendants having asserted the authority of Allen to make the contract made with Wiley and Dungan in plaintiffs' name, the burden was upon them to prove that authority, and having failed to satisfactorily prove such authority, their whole defense must fail. Knoche v. Whiteman, 86 Mo. App. 568; Burton v. Ins. Co., 88 Mo. App. 392; Arscheln v. Scott, 90 Mo. App. 352. (5) Wiley and Dungan, in dealing with Allen, were bound to know that Allen was not only the agent of the plaintiffs to sell the land, but that he had authority to make the exact contract he undertook to make with them. Bank v. Bank, 45 Mo. 528; Sturgeon v. Hampton, 88 Mo. 203; Hoster v. Langet, 80 Mo. App.

234; Mechem on Agency, secs. 273, 276; 1 Am. and Eng. Ency. Law (2 Ed.), 987, 994. (6) Even if it could be held that plaintiffs' authority to Allen to sell their land authorized him to sell the 480 3-4 acres alone and upon the terms sold, yet his agency not having been created for a valuable consideration and not coupled with any interest, plaintiffs had a right to revoke that agency at any time before a legal binding contract for the sale of the land was made, and having revoked whatever authority Allen had to sell the land before the contract relied upon by Wiley and Dungan was executed on June 12, they cannot compel a conveyance of the land under that contract. State ex rel. v. Walker, 88 Mo. 279; Glover v. Henderson, 120 Mo. 367; Burke v. Priest, 50 Mo. App. 310; Mechem on Agency, secs. 204, 207; Dunham v. Hortman, 153 Mo. 625. (7) Wiley and Dungan not having been misled by any act of plaintiffs, they were not entitled to notice of the revocation of Allen's authority to sell, if in fact he ever had authority. Hefferman v. Boteler, 87 Mo. App. 316; Hackett v. Van Frank, 105 Mo. App. 384; Fanning v. Cobb, 20 Mo. App. 577. (8) If the written authority to sell did not express all the terms of the authority, or embrace all the lands, or in any manner failed to evidence the true agreement between the the the parties, then it was permissible to prove a contemporaneous, consistent, oral agreement between the parties. Boggs v. Laundry Co., 86 Mo. App. 616; Ringer v. Holtzclaw, 112 Mo. 519; Weil v. Willard, 55 Mo. App. 376; Boyd v. Paul, 125 Mo. 9; State v. Cunningham, 154 Mo. 161. (9) The refusal of plaintiffs to execute a deed to Wiley and Dungan in accordance with the contract first made by Allen with them in his name, when requested so to do June 9, was sufficient to revoke Allen's authority to sell, if he in fact ever had authority to sell upon the terms of that contract. Dunham v. Hartman, 153 Mo. 625; 1 Am. and Eng. Ency. Law (2 Ed.), 1219. (10) Allen being a special and not a general agent, his au-

thority was limited to the doing of the identical things authorized in the contract, either by express provision or by necessary implication. The contract obligated the seller to give to the buyer a rebate of 6 per cent interest on the advance payment from the date of the payment till March 1, 1903. No authority for a provision of that kind can be found in the instrument upon which Allen relies for his authority — viz. Exhibit A. The same can be said of the provision of that contract which binds the seller to pay $20 on the examination of the abstract of title to the land. The authority under which Allen claimed to be acting nowhere either directly or by implication authorized any such contract as that to be made; neither did that authority authorize the stipulations as to time contained in the contract, nor the provision that time should be of the essence of the contract.

*Ed. E. Yates* and *Perry S. Rader* for appellants in reply.

(1) Plaintiffs ought not now to be permitted to urge that certain clauses in the contract were in excess of the agent's authority, because they did not make that objection at the trial, and they make it for the first time in their brief in this court. Plaintiffs in their petition ask that the contract which Allen as their agent had made with Wiley and Dungan be set aside because it was made "without the authority or consent of said plaintiffs," and for certain alleged frauds. They did not specify wherein Allen was lacking in authority to make it. At the trial the whole issue was whether plaintiffs had made the contract with Allen designated Exhibit A. Plaintiffs contended that they had made one contract for the sale of all the lands. Defendants contended that they had made two contracts, one (Exhibit A) authorizing Allen to sell the 480 3-4 acres of land which he sold to Wiley and Dungan, and the other

(Exhibit B) which authorized him to sell the 740 acres of bottom land. Those were the issues at the trial, and the issues determined by the decree. There is no finding in that decree whatever that Allen exceeded his authority in making a contract with the purchasers, if Exhibit A was a valid contract. Nor was such a point raised by any question asked any witness. When defendants offered the contract with the purchasers (Exhibit D) in evidence, plaintiffs made the objection that the "contract was executed without authority," not that Allen exceeded his authority. So that this objection is made here in this court for the first time. Now, is it fair, even in an equity case, for a party to sit by at the trial with a defense concealed up his sleeve and decline to make it known, and when, nevertheless, the decree is in his favor, and the other party has gone to the expense of taking an appal and paying for a transcript and printing an abstract and brief and hiring attorneys to prosecute his appeal, and when respondent sees that brief and realizes that all the defenses he urged at the trial must be ruled against him, to say to the appellate court: "I know I am defeated on every proposition that I urged at the trial, and on every issue that came into judgment in the trial court, but I had then, and knew I had, a defense up my sleeve which would have shown the contract which I sought there to have annulled to be an invalid contract, but which I did not then make known to the court or to my adversary, and which I did not then consider of sufficient importance to make it known, but now, on this appeal, as I feel I am defeated on every other ground, I wish to bring that defense from its hiding place, and ask the court to use it to crush my adversary?" Is that fair practice? Is it not a fact that this court is a court of review, and that it will not consider any objection here that was not made at the trial? In other words, is it not true that both parties must be held in this court to the case they made for themselves at the

trial? While this court will consider all the facts and render such judgment as the trial court should have rendered, yet is it not a fact that it will not determine any point which the trial court was not asked to rule upon? (2) It is the general rule, both in equity and law suits, that neither party will be permitted to make new issues in the appellate court. ''Parties are usually held bound on appeal by the positions they have taken in the trial court.'' Hall v. Goodnight, 138 Mo. 589; Hill v. Drug Co., 140 Mo. 438; Snell v. Harrison, 83 Mo. 658; 8 Ency. Plead. & Prac., p. 157; Wood v. Young, 5 Wend. (N. Y.) 637; Van Namee v. Groat, 40 Vt. 74; 1 Thomp. on Trials, sec. 693; Foster v. Bowman, 55 Iowa 239; St. Louis Bro. Co. v. Bagnell, 76 Mo. 554; Helling v. United Order of Honor, 29 Mo. App. 315; Denny v. Wickliffe, 58 Ky. 224; Brockenbrough v. Blythe, 3 Leigh (Va.) 641; Megahan v. Bank, 156 U. S. 232; King v. Meyer, 35 Cal. 644. Where the question of the agent's authority was not raised on the trial, it cannot be raised in the appellate court for the first time. Wheeler & Wilson Mfg. Co. v. Elberton, 84 Hun 501; Winchester v. King, 48 Mich. 280; Homestead Co. v. Duncombe, 51 Iowa 525; Walker v. Owen, 79 Mo. 563; St. Louis, etc., Assn. v. Delano, 37 Mo. App. 388; Shipley v. Bunn, 125 Mo. 445. Planters Bank of Farmville v. Whittle, 78 Va. 737, is much in point. It was an equity case. (3) But even on the merits, the clauses in the contract were not so in excess of Allen's authority as to defeat the right of the defendants to specific performance.

LAMM, J.—Lewis Lisle and R. B. Kilpatrick on February 15, 1902, owned 480 3-4 acres of land in section 2, township 55, range 21, in Chariton county, Missouri, described as ''52 acres, north part of northwest quarter lying west of the Wabash railroad and all of section 2 lying east of said Wabash railroad.'' These lands are called ''uplands.'' At that same time Lisle

and Kilpatrick owned 740 acres additional, in two parcels some distance apart—one cornering with their said uplands. These latter lands are called "bottom lands."

Sidney P. Allen was a real estate agent residing in Kansas City, Missouri, and had men employed in and about said business—one of them, Bryan, another, Englehart. Bryan and Englehart appear throughout the record as representatives of Allen.

Walter L. Wiley and Charles L. Dungan reside at Peoria, Illinois, and claim to have purchased said uplands through Allen, acting as agent for Lisle and Kilpatrick.

On the 16th day of June, 1902, there appeared of record in the office of the recorder of deeds of Chariton county a written agreement purporting to contract to sell said uplands to Wiley and Dungan for the sum of $21,120 ($44 per acre)—$3,000 paid down, the balance to be paid on or before March 1st, 1903, at which time a conveyance was to be made by Lisle and Kilpatrick to Wiley and Dungan. This contract (hereinafter to be set forth) purports to be executed by Lisle and Kilpatrick through Allen, Agt., and was acknowledged by Allen as such agent on the 9th day of June, 1902, in Kansas City, Missouri, and by Wiley and Dungan in Peoria, Illinois, on the 12th day of June, 1902.

To the February term, 1903, of the circuit court of Chariton county, Lisle and Kilpatrick lodged their bill in equity against Wiley, Dungan and Allen to have said recorded contract adjudged a cloud upon their title and removed. They further sought to recover damages in the sum of $5,000. The gist of the matter appears in the following paragraphs of the bill:

"That on the said 16th day of June, 1902, the defendants, wrongfully designing, contriving and confederating together to wrong and injure the plaintiffs and to prevent plaintiffs from selling and conveying said lands, wrongfully, maliciously and without the au-

thority or consent of said plaintiffs, or of either of said plaintiffs, caused to be filed in the office of the recorder of deeds within and for said Chariton county and there recorded in record book 75, at pages 49, 50 and 51, a certain instrument of writing, dated the 9th day of April, 1902, and regularly acknowledged by all said defendants, purporting to be a contract by and between 'R. B. Kilpatrick and Lewis Lisle, by Sidney P. Allen, their agent,' as parties of the first part, and said Walter L. Wiley and Charles L. Dungan, as parties of the second part, whereby said Kilpatrick and Lisle appear and purport to contract and become bound to sell and convey the above described lands to said Wiley and Dungan at and for the price and sum of $21,120 and to deliver possession of said lands to said Wiley and Dungan on the 1st day of March, 1903; said pretended contract further reciting the payment of $3,000 of said supposed purchase price to said Allen as agent for plaintiffs at the time of the signing of said contract, and purporting to require the payment of the remainder of said pretended purchase price and the delivery of a warranty deed for said lands on the 1st day of March, 1903.

"Plaintiffs further state that said Allen executed said paper without any right or authority whatever from plaintiffs, or either of them, as his co-defendants well knew and understood at the time of executing and accepting said pretended contract; that said pretended contract is not and never was the contract or agreement of said plaintiffs or either of them; and that said pretended contract and the recording thereof constitute a cloud upon plaintiffs' title, and were wrongfully designed and contrived by said defendants to prevent, and have in fact, prevented plaintiffs from selling their said lands, to plaintiffs' damage in the sum of five thousand dollars."

Wiley and Dungan appeared and by answer admitted certain averments, denied others, and by way

of crossbill alleged facts which, if true, entitled them
to have said contract specifically enforced, with dam-
ages in rents and profits, and they prayed a decree ac-
cordingly.   They furthermore pleaded a tender in ac-
cordance with their alleged contract of purchase, and
set forth facts which, if true, entitle them to alternative
relief by way of damages in interest on the whole pur-
chase money (which they claim to have kept on hand),
and damages in loss of profits on their bargain, *i. e.,* in-
crease in the value of the land, in case the title prove
defective or the deeds to be made by Lisle and Kilpat-
rick do not convey a fee simple title.

Allen answered by way of denials and admissions,
furthermore averring the validity of the contract of
sale and further alleging facts which, if true, entitled
him to commissions from plaintiffs in the sum of $1,890,
four dollars per acre.

To these separate answers, plaintiffs replied with
a general denial.

On the hearing, the court entered a decree making
specific findings (to be referred to further along), de-
creeing the contract void and to be cancelled and an-
nulled; that plaintiffs recover from Allen one cent
damages; that Dungan and Wiley recover of Allen
$3,000 (an advance payment); that relief be denied Al-
len, and that Allen pay the costs.

This decree settled the controversy to the mutual
dissatisfaction of all parties, and each of them took
preliminary steps towards prosecuting an appeal—a
joint bill of exceptions being filed.   However, plaintiffs
abandon their appeal, and the matter stands in this
court on assignments of error by Wiley and Dungan on
their behalf, and by Allen on his own behalf.

The facts uncovered at the trial are as follows:

On the 15th day of February, 1902, Englehart ap-
peared at Sumner, in Chariton county, representing
Allen in his real estate business, and not plaintiffs. Al-
len was unknown to Lisle and Kilpatrick.   Englehart,

however, was favorably known to them and, in the language of Kilpatrick, he "was supposed to be a great land agent, and we listed with him; we wanted to sell it all, wanted to quit, quit farming, and listed it with him to sell it, we wanted to sell it all." As the result of this interview two separate powers of attorney are claimed by defendants to have been executed to Allen by Lisle and Kilpatrick. One hereinafter referred to as "Exhibit A," related to the uplands. It was on a card form used by Allen and was partly in print and partly in writing—the writing being done by Englehart, and in the office of one Lewis. Exhibit A is as follows:

"We, Kilpatrick and Lisle, of Sumner. P. O., Chariton county, State of Missouri, hereby authorize Sidney P. Allen, of Kansas City, Missouri, to sell the following described real estate, situate in the county of Chariton, State of Missouri, to-wit: 52 acres, north part of northwest quarter lying west of the Wabash railroad and all of section two lying east of said Wabash railroad in township 55, range 21, containing in all 480 3-4 acres, and to make contract therefor in my name, subject to the conditions hereinafter named. I agree to accept in full payment of said farm the sum of $40.00 per acre net to me, and the difference between said price and the price actually received shall be the commission of said Sidney P. Allen. In payment of the above mentioned sum net to me, I agree to accept all (or not less than $2,000) cash and balance March 1, 1903, as [or] when purchasers take possession. I agree to give possession of said premises March 1, 1903. I hereby agree not to price said farm for less than $45 per acre to any party furnished by Sidney P. Allen. It is understood that there is a mortgage of $—— on said farm, dated —— in favor of ———, due ————.——, running at ———— per cent, interest, which I agree to pay off and release, as purchasers may wish. I agree in case of sale to give purchaser a general warranty

deed to the above described premises, and to furnish him a complete abstract, which shall show a fee simple title in me.

"This authority is irrevocable for a period of six months from its date.

"Witness my hand at Sumner, Mo., date Feby. 15, 1902.

"LEWIS LISLE, Owner,
"R. B. KILPATRICK."

The other power of attorney is in all things a duplicate except that it described the bottom lands, and except that it provided as to one tract of these lands a net price to Lisle and Kilpatrick of $19 per acre, and as to another tract of the bottom lands a net price of $25 per acre; and except, that, if either tract of the bottom land was sold, Lisle and Kilpatrick were to accept $1,000 cash payment, and if both were sold, a $2,000 cash payment. This power of attorney, referred to as "Exhibit B," was on the same card form as Exhibit A, entirely separate from it—Exhibit A being earmarked "No. 488," and Exhibit B "No. 487." The principal controversy is pitched about these powers of attorney. Plaintiffs testified the agreement was that all of their land was to be sold, or none; that the uplands were of greater value and (as one hand washes another) were to be used to help sell the bottom land. They testified they signed but one power of attorney and it was written wholly on one card. Mr. Lewis, in whose office the powers were written, was paying but little attention to the contract, and when called as a witness, he could not say whether the land was to be sold, all or none, but he does say he "remembers" seeing only one card. When shown Exhibits A and B while on the stand, plaintiffs severally would neither admit nor deny their signatures to Exhibit A. As to Exhibit A, Mr. Lisle said "it looks like my handwrite." When asked if Exhibit A was one of the contracts he signed, his answer was: "I think it is part of it. . . . There

was other land listed with it. . . . I signed one contract is all I signed." When shown Exhibit B and ask to say if that was not the other contract he signed, his answer was, "I only signed one contract." Being pressed as to whether he signed Exhibit B, his answer was again, "I only signed one." Being further pressed with the same question, he adopted the same formula by way of answer, and said, "I signed one contract is all I signed." Then the following questions were asked and answers given: "Q. Did you sign this paper (Exhibit B)? A. I don't know whether I did or not. Q. Did you sign that name, 'Lewis Lisle,' to that paper? A. I signed one card. Q. Did you sign that name, 'Lewis Lisle,' on this paper? A. I signed one contract. Q. Did you sign that name, 'Lewis Lisle,' on this paper? A. It looks like it, I don't know whether I signed it or not; I just signed one contract. Q. Will you say you did not sign that name? A. No. sir."

Further along, having been shown both Exhibits A and B, the witness took refuge in the same proposition, to-wit, that he signed only one card and one contract, and, at great length, page after page, he reiterated that the signature looked like his, that they were both alike, that he would not say either of the signatures was his, that he would not say either of them was not his, that he could not pick out the card he did sign nor could he reject either card as not bearing his signature. And then the following occurred:

"Q. Can you say that you did not sign it? A. I signed one contract, I will say that much.

"Q. Can you say that either one of these contracts is the contract you signed? A. I could not say that.

"Q. Can you say you did not sign either one of these contracts? A. I didn't say it, I haven't said it yet; I said I signed one contract for Mr. Englehart.

"Q. Will you say you did not sign either one of these contracts? A. I won't say that.

"Q. Then, if I understand you, you will neither say that you did or did not sign it? A. I have done said the best I could.

"Q. Do I understand you correctly as saying you will not say that you did or did not sign it? A. I said I signed one contract for Mr. Englehart.

"Q. But you will not say that you did or did not sign these contracts that I have shown you? A. I haven't said it, no, sir."

Kilpatrick's evidence was to like effect and of the same evasive character. On his examination in chief, he testified as follows. "I never had any contract with them *except that little card;* never gave them any authority to make any other; never made any." He further testified, as did Mr. Lisle, that neither of them authorized the making of the contract relating to the uplands, sought to be annulled as a cloud on their title. On cross-examination, the following occurred:

"Q. Mr. Kilpatrick, you say that you never had any contract with them except that little card? I will ask you if this is the little card that you refer to, which I hand you, paper marked 'Exhibit A'? A. It looks very much like it.

"Q. You signed that little card, didn't you? A. I signed one little card; I will read this and see whether this is the card I signed.

"Q. Examine it and look at your signature there and see whether or not you signed it? A. That looks like my signature, but there isn't enough on that card.

"Q. There isn't enough on it? A. No, sir.

"Q. You did sign that little card? A. It looks like it, yes, sir.

"Q. It looks like it and you think you signed it? A. Yes, but there isn't land enough on there.

"Q. You think you signed this card? A. I said I signed one card, but there is not land enough there.

"Q. Don't you think you wrote your name 'R. B.

Kilpatrick?'  A. I said I wrote my name on one card that looked similar to that.

"Q.  Didn't you write this?  A.  I won't say that I wrote that; I signed one, but there is not enough land on this.

"Q.  You won't say you did sign this, and you won't say that you did not sign it?  A.  No, sir; I said I signed one card; but there was to be four hundred and twenty and one hundred and sixty acres of more land on that.

"Q.  Don't you know, as a matter of fact, Mr. Kilpatrick, that that is you signature and you wrote it? A.  I won't say I wrote that; I wrote one, but that isn't the way I understood the card was that I was to sign.

"Q.  Look at it again?  A.  I looked at it.

"Q.  Don't you think you wrote that signature? A.  It looks some like it; I must have been pretty boozy, if I did sign it.

"Q.  Were you boozy that time?  A.  I couldn't say that I was, it has been so long since; there is some resemblance there to my writing.

"Q.  I will call your attention to Exhibit B and ask you if you signed that little card?  A.  That don't look very much like it, sir.

"Q.  It don't?  A.  No, sir.

"Q.  You think you did not sign that?  A.  I never made a "B" like that in my life.

"Q.  Then you say you did not sign that?  A.  No, sir; I wouldn't say that I had signed either one of these; I signed a card that was supposed to have all of that land on it; it was read to me and I read it myself.

"Q.  Do you say you did not sign that card?  A. I won't say I did or didn't, but that don't look very much like my signature.

"Q.  But you think the other one does look like your signature?  A.  It is similar to it; yes, sir.

"Q.  You think the other one looks more like your

signature than that one? A. Yes, sir; it looks more like it.

"Q. Are these like the little cards they had there on that occasion? A. Something similar; yes, sir; but I didn't see but one."

Mr. Englehart testified that plaintiffs did desire to sell the upland and the bottom lands at one and the same time and so expressed themselves to him, but that he talked it over with them and showed them that it was very difficult to get a purchaser for so large a body of land disconnected as the tracts were, and explained to them the unwisdom of such plan of procedure. That they finally agreed with him that the upland and the bottom lands might be sold separately and thereupon he drew the separate powers of attorney evidencing the agreement and plaintiffs signed them in his presence after reading them over. His testimony on that score is as follows:

"I wrote the body of that contract [power of attorney, Exhibit A], all the written part of it. It is all in my handwriting. It was prepared in the office of a gentleman by the name of Lewis, at Sumner, Missouri, on the date given here, February 15th, 1902. Mr. Lewis Lisle and Mr. R. B. Kilpatrick signed that contract. I saw them sign it. They both signed the card with their own hand, at that time and in my presence.

"Q. Did they sign any other contract at the same time? A. Yes, sir.

"Q. I hand you a paper marked Exhibit B, and ask you if that is the other contract that they signed at that time? A. Yes, sir.

"Q. Did they sign that contract with their own hands? A. They did.

"I wrote all the written words in that contract. That contract marked Exhibit B is, at the present, just as it was when they signed it. The contract marked Exhibit A is in the same condition as it was when they signed it. No changes of any kind have been made in

either of those contracts. No other contract was on that occasion signed by Kilpatrick and Lisle except the two contracts, Exhibits A and B, that I hold in my hand. There was no other signed by them that I now remember.

"We were some little time in the office talking over the matter when the contracts were signed; I think, perhaps, an hour or an hour and a half. After talking it all over and understanding the matter I wrote out the contract. I wrote it out at the conclusion of our talk. After writing them up and understanding them, they were both immediately signed by Kilpatrick and Lisle. They both read over the contracts before they signed them. Those contracts were signed on February 15, 1902, the day on which they bear date. They were signed between three and five o'clock of that day, somewhere about that. I left Sumner on the evening train. I do not recall just what time. I went from there to Bucklin. I sent those cards by mail to the office at Kansas City. I mailed them to S. P. Allen at Kansas City."

There was expert testimony to the effect that plaintiffs' signatures were genuine, and none to the contrary.

The chancellor by his decree made the following findings, *inter alia*:

"And the court finds, from the weight of the evidence, that plaintiffs did not execute the two exhibits 'A' and 'B' as separate papers in manner and form now appearing, and that defendant Allen was not authorized to sell the land in controversy as a separate transaction at the price of $40 per acre. The integrity of the execution of these exhibits 'A' and 'B' having been brought in question by the evidence, the court finds in relation thereto that the signature of plaintiffs to exhibit 'A' are their genuine signatures, but that the figures indicating the purchase price at which the four hundred and eighty acre tract was authorized to be sold have been erased and the figures indicating the

price as $40.00 substituted in lieu of the original figures written therein.''

Referring to that portion of the aforesaid finding relating to an erasure, it may be said the original contracts were before us as submitted to the chancellor below. It is apparent that in Exhibit A the blank left after the dollar mark for the insertion of the net price Lisle and Kilpatrick agreed to take per acre, had been originally filled with a figure or figures, or a mark or marks of some sort, now erased, and that the figures ''40'' were written over such erasure, following the dollar-mark. It can not be determined what figures or marks were originally there, nor is there any indication of change in ink or handwriting or such suspicious indicia. Nor did plaintiffs introduce any evidence impeaching the integrity of Exhibit A, - except they claimed all the land (upland as well as bottom) should have been, but was not, written in said power of attorney in the blank space provided in said power for inserting the description of the land. Nor did plaintiffs' attorneys object to the introduction of Exhibit A on the ground of spoliation, nor was any evidence on either side directed to a challenge, or issue, of that sort. In this connection, it may be said, furthermore, that it seems the chancellor was of the opinion that ''$30'' had been originally written into this power of attorney instead of $40 now appearing, and this, too, on the theory that plaintiffs had testified ''all their lands were to be sold or none for the average price of $30 per acre.'' We have searched in vain in the record for such evidence, and we suppose the misapprehension in the trial judge's mind came as an echo of the testimony of one Kellogg, a real estate agent of Keytesville, Chariton county, who testified in chief that in February, 1902, he had plaintiffs' upland listed for sale at $40 an acre. On cross-examination, he testified, among other things, that in his talk with plaintiffs prior to his own listing of the land, i. e. prior to the time Allen

listed it, they fixed the price of the upland and bottom lands together at $30 an acre. But plaintiffs did not testify in accordance with the finding of the court.

There was evidence pro and con on the selling price of such lands as plaintiffs' upland at the time of the execution of Exhibit A. Some of the testimony showed plaintiffs had listed these uplands at $40 an acre with other agents, as said. There was other evidence indicating that was a fair price for it on the 15th of February, 1902; that there had been a drought and crop failure in the prior year and the price of lands, affected thereby, ruled rather low; but in the spring and early summer of 1902 appreciated somewhat. Plaintiffs introduced evidence tending to show that in April, some two months after their contract with Allen and within its life, they had been offered $45 an acre for these uplands and refused that price. All the testimony indicated that prices appreciated from thence onward until the time of the trial.

In this connection it may be said, furthermore, that there was evidence from plaintiffs themselves that they had sold their lowlands after February 15th, 1902, but the date of this sale, prior to the trial, was not disclosed. There is also testimony that in August, 1902, as we understand it, they contracted to sell their upland at $50 per acre and were unable to consumate the sale because of the record of the contract complained of in their bill. And there was evidence from plaintiffs that they were not willing to take $40 for their uplands on February 15th, 1902, and other evidence that the best way to get the best value out of the land was to sell upland and lowland together.

It appears that Allen, through his representatives, busied himself in the sale of these lands during the life of Exhibit A; that he caused several prospective Illinois buyers to be taken to and shown the lands; that on the 9th day of June, 1902, Bryan, representing him, contracted to sell the land to defendants Wiley and

Dungan at $44 an acre. Bryan assumed to enter into a contract with Wiley and Dungan in the name of Allen as party of the first part. There is no evidence before us, one way or the other, as to whether Wiley and Dungan knew the land belonged to Lisle and Kilpatrick or knew that Allen was acting in a representative capacity for an undisclosed principal, or was owner of the land. They were strangers to that neighborhood, strangers to Allen and strangers to Lisle and Kilpatrick. That they acted in the utmost good faith in this transaction and in the making of the contract with Bryan appears by this whole record and seems to be somewhat conceded by plaintiffs, and, by indirection, was found by the court. They turned over to Bryan $5,000—$3,000 to apply on the land in question, and $2,000 to apply on a purchase disconnected from this case, and straightway returned to their homes at Peoria. The terms of the written contract made between them and Bryan, acting for Allen, are not material further than it may be said the same terms appear in the contract sought to be annulled.

As we gather from the record, the contract made by Bryan, Wiley, and Dungan was executed in duplicate on the morning of June 9th, 1902, at Chillicothe, Missouri, and one of said contracts forwarded the same day to Kansas City with the said draft of Wiley and Dungan and received there by Allen. On that same day, Allen in Kansas City prepared, signed and acknowledged the written contract first aforesaid, and three days later Bryan appeared in Peoria, and procured Wiley's and Dungan's signatures and acknowledgments thereto and procured the contract to be recorded, as said.

In the meantime, and, as we infer, on the 9th day of June, Englehart, who had been that day in Chillicothe, appeared at Sumner and saw Lisle and Kilpatrick. He had with him a draft for $2,000 drawn by Bryan on Allen and he proposed to deposit the draft

as so much cash in the bank and have Lisle and Kilpat-
rick execute the deed to the land.   There is a sharp
clash in the testimony at this point. Controversies then
arising covered several weeks and were renewed off
and on.  On the day in question, Englehart testified he
saw Lisle, and Lisle told him to wait until Kilpatrick
came home before going ahead; that Lisle expressed
no unwillingness to make the deed; Englehart tele-
phoned to Keytesville for Kilpatrick and Kilpatrick
came in response to his summons; that thereupon later
in the evening Lisle said to Kilpatrick, "Well, they
have sold it according to the arrangements; just as well
go ahead and fix the matter up;" that Kilpatrick raised
a question about some improvements made;  said they
ought to be paid for; that when Lisle made the remark
about going ahead, later in the evening, Kilpatrick said
that his wife didn't want to sign the deed and he didn't
know how to go ahead and finish it up; that both Lisle
and Kilpatrick knew the upland alone had been sold,
made no objection to the draft and Kilpatrick only
raised the question of improvements and his wife's re-
fusal to sign the deed; that neither of them raised any
question about having signed the power of attorney at
that time.  The improvements are shown to have been
some fencing of little moment.  The question of exe-
cuting only one contract and that all the land was to
be sold or none, according to Englehart, was not raised
until eight or ten days later when Bryan was present.
Lisle, in rebuttal, denied telling Kilpatrick in Engle-
hart's presence the land was sold according to agree-
ment and they might as well go on and carry out the
contract.  Kilpatrick's version of the conversation with
Englehart is to the effect that he got a telephone mes-
sage at Keytesville to return to Sumner; that he, Engle-
hart, had sold the land; that he went home on the after-
noon train and saw Englehart and "he told me he had
just sold the home place; I says that don't go . . . I told
him I wouldn't sell because I had been offered $45 an

acre from another man and wouldn't take it. Q. And you told him you wouldn't sell? A. Yes, sir. Q. I will ask you, Mr. Kilpatrick, if the only reason that you gave him for refusing to carry out that contract after you learned the 480 acres of land had been sold was that your wife refused to make the deed? A. Not exactly all, no, sir. Q. Did you tell Mr. Englehart that was the reason? A. She told him that she wouldn't sign the deed." He further testified: "I told Mr. Englehart right up there in the hotel that I wouldn't sign the deed that way because I wouldn't sell my good land when I had refused more money for it." On being inquired of why he didn't tell Mr. Bryan he had never signed but one contract at a certain time afterwards, when a tender of $2,000 in gold was made, he testified that "he said he had the contract *and I told him I didn't care to see it*. I wasn't going to sell the land. Q. Did you look at the contract? A. No, sir, I don't think I did." On being inquired of if he didn't tell Englehart at the time he was informed his land was sold that if he, Englehart, would go down on the river with him and fish awhile he would fix it up, Kilpatrick answered: "I wouldn't say I did or didn't; I always tried to treat him nice and go fishing when he was there. Q. Don't you think you told him that? A. No, sir; I wouldn't say that I did or didn't." On being recalled, on re-cross-examination the following occurred:

"Q. Mr. Kilpatrick, you did say to them that you wouldn't execute the deed and carry out your contract because your wife wouldn't sign it, didn't you? A. She said she wouldn't.

"Q. You told them that? A. Why, I said it was not according to the contract, and I would never sign it till they sold all the land.

"Q. Didn't you tell them . .? A. I might possibly have told them my wife wouldn't sign the deed, she said she wouldn't do it; she is a Virginian and she pretty near sticks to what she says.

"Q Why did you tell Bryan and Englehart that? A. Because she said she wouldn't sign the deed.

"Q. Wasn't you giving that as a reason to them why you couldn't carry out your contract? A. I don't know as I was, particularly, because they hadn't sold the land according to my contract.

"Q. Wasn't you, as a matter of fact, giving that as a reason why you wouldn't carry out the contract? A. The deed would not have been any account without her signature, and she said she would not sign it.

"Q. And you told them that? A. Yes, sir."

Running through the whole month of June, at odd spells, efforts were made by Bryan and Englehart to have the deed executed and deposited in the bank, but these efforts were without avail. In one of them Bryan testifies, and it remains uncontradicted, that they went to see Mrs. Kilpatrick about making the deed, and Mr. Bryan tells what occurred, thus: "I suggested that we go over to the house and see Mrs. Kilpatrick; so Mr. Kilpatrick, Mr. Englehart and myself went there to the house and had an interview with Mrs. Kilpatrick, and I had not any more than met the lady when she told me she did not propose to sell the land; that Mr. Englehart had offered them $2,000 before, and that Mr. Kilpatrick had an old pair of pants hanging up there with more money than that in them, that they didn't care for that."

The great weight of the evidence indicates that on June 9th, and for quite a while afterwards, the principal controversy was over the objections plaintiffs had to making the deed, viz., that they had been offered more for the land, that it was worth more at that time and that Mrs. Kilpatrick would not sign the deed. But it was agreed on all sides that sometime subsequently plaintiffs refused to go on with the contract because they claimed they were not bound by it and there was a fatal infirmity in the power of attorney.

The recorded contract struck at in the bill is as

follows (it is proper to state the date 9th of April, 1902, is shown to be a clerical error of the stenographer, April having been written for June) :

"This contract, made and entered into this ninth day of April, 1902, by and between R. B. Kilpatrick and Lewis Lisle, by Sidney P. Allen, their agent, of the county of Jackson, State of Missiouri, the seller, and Walter L. Wiley and Charles L. Dungan of the county of Peoria, State of Illinois, the buyer.

"Witnesseth, the seller has bargained and sold to the buyers the following described real estate, situated in the county of Chariton, State of Missouri, to wit: Fifty-two acres, the north part of the northwest quarter lying west of the Wabash railroad in section two, and all that part of section two lying east of the Wabash railroad, all in township fifty-five, range twenty-one west, containing 480 3-4 acres. At and for the price and sum of twenty-one thousand one hundred and twenty dollars, to be paid as follows: Three thousand dollars at the signing of this contract, the receipt whereof is hereby acknowledged by the seller, and which is deposited with Sidney P. Allen, as part of the consideration of the sale, and the balance whereof is to be payable in the following manner, to wit: Eighteen thousand one hundred and twenty dollars cash, March 1, 1903, which is the date of the delivery of the deed and possession of said land. The buyers hereof are to have a 6 per cent rebate on their advance payment from the date of the payment until March 1, 1903.

"The seller hereof is to pay twenty dollars on the examination of the abstract to the above described land.

"The seller agrees to pay all state, county and general municipal taxes which are now due and payable, and to pay all special taxes and assessments which are now liens on said property, and the taxes for 1902, and all subsequent taxes to be assumed and paid by the buyer.

"The buyer has the option of taking assignment of insurance policies now on said property, and to pay therefor the amount of the pro rata unearned premium from the date of delivery of deed, to the expiration of said policies.

"The seller is to furnish, within 30 days from the date hereof, a complete abstract of title to said property from United States to the present record title, with such usual certificates as may be required by the buyers, as to taxes, general and special condemnation proceedings, judgments and mechanics' liens, from the various courts in which judgments would be liens thereon; and the buyer is to have 30 days for the examination thereof and for submitting to the seller a memorandum of such requirements as they may consider necessary to perfect the title, by any attorney they may choose.

"If the title be found to be defective, the seller agrees to have the defects rectified within a reasonable time, which is not to exceed 30 days from the date at which the transfer of the property is to be consummated, under the terms of this contract; but in case such defects in the title cannot be cured or remedied within that period, and no extension of time is had between the parties, this contract is to be null and void, and the sum of $3,000 deposited as aforesaid, is to be returned to the buyers.

"If, though, the title be good, and the seller has kept his part of this contract, the buyers fail to comply with its requirements on their part, within thirty days after being furnished with the abstract of title, then the aforesaid deposit of $3,000 shall be forfeited to the seller, but for this cause this contract shall not cease to be operative as between the parties hereto.

"If upon examination it is found that the seller has a good title in fee to said property, he agrees to execute and deliver to the buyers or order a good and sufficient deed thereto, properly executed, free and clear of all liens and incumbrances of every kind, excepting

only such as are to be assumed by the buyer hereunder, and concurrently herewith, and as part of the same transaction, the buyers to pay the balance, if any, of the agreed cash payment, and to deliver to the seller notes and deeds of trust, as specified above.

"Time is and shall be the essence of this contract, and the sale and transfer of said property, according to the provisions hereof, shall be consummated within the time specified above."

The record shows that when Bryan appeared at Peoria and procured the foregoing contract to be signed and acknowledged, he explained to Wiley and Dungan that a new contract was desirable because Allen had not personally signed the other contract. He explained, further, that the other contract was not acknowledged, and he stated there was "some trouble." The nature and character of this trouble were not explained to the purchasers, but Bryan stated he wanted the "signatures certified to" to entitle the contract to record.

Other than disclosed as aforesaid, it was not shown that plaintiffs had taken any steps to revoke the power of attorney evidenced by Exhibit A, or had notified Allen the power was revoked. It is not shown that Allen had personal knowledge of the controversy with Englehart on the 9th day of June, or that his execution of the new contract on that date was based on such (or any) controversy. It stands conceded, furthermore, that plaintiffs never notified Wiley and Dungan of any revocation of Allen's authority, although they might have known on the 9th of June that Wiley and Dungan were the purchasers, nor did they make any inquiries or take any steps looking to the notification or identification of Wiley and Dungan.

It may be said, furthermore, that tender of the $2,000 earnest money as an advance payment, and tender of the whole purchase price at the contract time, with a demand and refusal of performance, were proved

at the trial. The rental value of the lands was shown to be from $2.50 to $3 per acre. There was no evidence that Wiley and Dungan had kept the purchase money intact and on hand as alleged in the answer, and it was shown that Allen still retained the original payment of $3,000. Nor is the character of Lisle and Kilpatrick's title disclosed.

As shown heretofore, the court found that Exhibits A and B were not executed in manner and form now appearing; that Allen was not authorized to sell the land in controversy as a separate transaction at the price . . . . . . . . of $40 per acre; that Exhibit A had been spoliated; and the court found, furthermore, that plaintiffs did not sign Exhibit B, and further that plaintiffs on the 9th day of June, 1902, revoked Allen's authority to sell; and found, as a matter of law, that the recorded contract was executed without authority from plaintiffs, and thereupon rendered judgment as hereinbefore set forth.

On this record, can the decree, *nisi*, stand?

I. Manifestly the allegations of the bill, charging a wrongful and malicious contriving and confederating between defendants to wrong and injure plaintiffs and prevent them from selling their land by the record of the contract in question, are not sustained by the proof. It is rudimentary that fraud need not be proved by direct testimony. Fraud may be shown by the proof of facts from which it may be naturally and reasonably inferred. Fraud, too, may be shown by the proof of isolated facts, sometimes of little significance, standing apart and alone, but when put together in natural relation may furnish indubitable evidence of its existence. But fraud must still be proved; it may not stand upon a fog of suspicion, or be based alone on mere presumption. The law indulges the presumption of good motives, honestly being a natural attribute of the average man, and, hence, when an act may be as fairly attribu-

ted to a proper, as to a bad, motive, the proper motive is presumed to exist.

In this case, assuming for the present that Allen was an agent, he could not, without an existing power of substitution (a power absent here) delegate his agency to Bryan; and, therefore, when on the 9th of June he had laid before him a contract made by Bryan, as his representative, with Wiley and Dungan pertaining to the sale of real estate which he, Allen, had authority to sell for Lisle and Kilpatrick, there was nothing more meet and reasonable than that he should put that contract in legal form—in a form his principals could readily enforce, and, hence, nothing more reasonable than that he should procure its re-execution by the purchasers. Allen was by no means obliged to assume the relation and responsibility of owner and seller of the land in question—a relation Bryan's memorandum placed him in. His contract of agency did not so contemplate and justice to himself and all concerned allowed the execution of a new contract—a contract telling the truth and putting all parties in proper relation to each other. So, too, the record of such contract, assuming for the present it was a binding contract, is contemplated by the law as a muniment of title. That record but preserved and protected the interests of all parties—provided, of course, the contract itself was made under authority; and the hindering of another sale by the land owners, flowing as an incident from the mere record of the contract, becomes proper or improper by reference alone to the validity of the contract itself, or the refusal of the purchasers to perform. If that contract be valid, why should a court of conscience concern itself with the annoyance of the land owners, springing from their inability to violate it, or their inability to surmount the record bar in the way of its violation?

The decree, in our opinion, can not stand on the theory of wrongful confederation and fraudulent pur-

pose in making the record and contract in question; but must stand, if at all, on the theory the contract was made without legal authority in Allen to make it at the time it was made.

II.   Did Allen have authority to make the recorded contract?   This question seems the turning one, and its consideration seeks the validity of the power of attorney, Exhibit A—the source of Allen's authority. The burden of showing that validity rests upon the purchasers who assert the right to specific performance and upon the agent who asserts the right to compensation, and, therefore, carried the burden of tracing the contract back to its original source in the power.   Whoever deals with an agent is put on his guard by the facts and it is his right and duty to inquire into and determine the agent's authority, and whether the contract about to be made will bind the principal.   [Johnson v. Hurley, 115 Mo. l. c. 519, et seq.; Mechem's Agency, sec. 273.]   In Deputron v. Young, 134 U. S. l. c. 256, Chief Justice FULLER said, speaking for the Supreme Court of the United States: ''The rule is well settled that 'in the case of a naked power, not coupled with an interest, the law requires that every prerequisite to the exercise of that power should precede it.   The party who sets up a title must furnish the evidence necessary to support it.   If the validity of a deed depends on an act *in pais,* the party claiming under it is as much bound to prove the performance of the act as he would be bound to prove any matter of record on which the validity of the deed might depend.' ''

In this case, the authority of Allen is denied by the petition and here his authority is challenged on various grounds.

(1)   In the first place, it is said that Exhibit A was spoliated, changed in a material part, to-wit, the net price to be received by the owners.

(2)   In the second place, it is challenged because

197 Sup.—11

the authority given to make a sale conferred only the right to sell the upland with the bottom land—all or none.

(3) In the third place, it is challenged because the donors of the power revoked the same.

(4) In the fourth place, it is challenged because, conceding *arguendo* it existed and had not been revoked, the contract made was not in accordance with the power and, therefore, is invalid.

Of these in order.

(a) The spoliation of Exhibit A was not asserted by the learned counsel of plaintiffs below. They made no objection to it on that score. No question was aimed at that fact. No answer of any witness was directed thereto. No paper issue was made thereon. In this condition of things, the learned chancellor put this and that together and made findings, and presumably based, *pro tanto,* a decree on those findings. The two facts found by the chancellor were, first, he discovered by visual examination that the paper bore evidence of an erasure and that the figures "40" after a dollar mark were written over that erasure. The second fact was that the agreement actually made between Allen and the owners of the real estate was that the lowland and upland should be sold together so as to net $30 per acre, and these figures presumably once had place in the writing.

A decree should be responsive to the findings. Findings, on the other hand, should be responsive to the issues and facts proven. Suffice it to say of these findings, they are neither within the pleadings nor the proofs, and, hence, the decree (in so far as bottomed thereon) is without support in the record. If the pleadings were silent on an issue, but if such issue were covered by the proofs below, then a decree based thereon might stand on appeal, although no amendment were made, if the case had been tried on the theory that such issue was in the case and submitted. [Bragg v. Rail-

road, 192 Mo. 331.] But where, as here, neither allegation nor proof is supplied, it is a proposition material to the administration of the law and the interest of litigants that a decree based on such finding ought not to be sustained. [Reed v. Bott, 100 Mo. l. c. 67; Schneider v. Patton, 175 Mo. l. c. 723; Newham v. Kenton, 79 Mo. 382.]

Conceding a prior erasure, and conceding that the figures "40" were written over it, yet erasures and interlineations are but ordinary incidents in the genesis of a contract. Of themselves, without other indicia of spoliation or fraudulent intent, they amount to nothing, and, furthermore, in the absence of proof to the contrary, are presumed to have been made prior to its execution. [Stillwell v. Patton, 108 Mo. l. c. 360, et seq.] Not only so, but in this case there was affirmative and uncontradicted evidence that Exhibit A at the trial was in the same condition as executed, and substantially the same may be said of Exhibit B.

Conceding that everything most to his disadvantage is to be presumed against the spoliator (*contra spoliatorem omnia praesumuntur*), yet here is no spoliator and, under the facts of this record, the matter in hand must be ruled against plaintiffs.

(b) Did Exhibits A and B evidence the contracts between Allen and his principals? If so, the contention that the right to make any sale depended upon the disposition of all the land at the same time must also be ruled against plaintiffs.

The trial court found that Exhibit B was not signed by plaintiffs. In so far as oral evidence is concerned that court occupies a post superior in advantage to an appellate court. The rule is not so broadly stated with reference to documentary proofs. In this case there were both oral and documentary proofs, and conceding the rule to be that this court should defer somewhat to the findings below, yet it is our duty to supervise the decree, to reconsider the record facts and to see that

equity is done. [Johnson v. Stebbins-Thompson Realty Co., 177 Mo. 581; State ex rel. v. Jarrott, 183 Mo. 204.] We have examined the record to see if the finding of the learned chancellor to the effect that Exhibit B was not signed and executed by plaintiffs can be sustained, and we are unable to agree with him in that finding. The testimony of Lisle and Kilpatrick on that score is unsatisfactory; and the finding of the chancellor as to Exhibit B went farther than plaintiffs were willing to go on their oaths—was more gracious to them than the proof allowed.

The finding below was that Exhibit A was signed by plaintiffs and, in our opinion, the same finding should have been made as to Exhibit B.

Did these exhibits contain the whole contract of agency? The burden was upon defendants to show the execution of these instruments. When this was done, the burden shifted to plaintiffs to show that by accident, fraud or mutual mistake a material part of the agreement was omitted—the omission asserted being a provision that upland and lowland should be sold at one and the same time—all or none. The trial court made a finding to that effect, but in so doing we think erred. That the question was discussed, we have no doubt, but the presumption is that all preliminary oral talks were finally merged in the written contracts of agency. It is hornbook law that to have reformed them in equity would have required cogent, clear, unequivocal and convincing proof. On the other hand, to establish the fact that a material and vital provision was omitted, and to go further and show that such material and vital provision was violated and that by such violation the contracts were avoided, on principle should require the same general satisfactory character of proof called for to reform them. Such proof was not offered in the case at bar.

In this connection, it may be said plaintiffs do not plant themselves on the proposition that the powers of

attorney were not executed by them, but that by accident, fraud or mutual mistake a beneficial and vital provision was omitted. No such allegation is in the petition. No evidence directed to that precise contention is in the record. The testimony of plaintiffs in relation to the advisability of making a sale of all their land at one time, and in relation to their wishes and feelings in that behalf, is all in accordance with the testimony of Englehart that such very matters were gone over, but that finally the powers were drafted in strict conformity with the understanding mutually arrived at. Plaintiffs are men of intelligence. The evidence is they read the powers of attorney. They were written in a friend's office and in his presence. They are short, concise and simple. They are mostly in print of good size type. The portion in script is plainly written. There is no evidence worthy of the name of accident, of fraud or of mutual mistake of fact, or of fact mixed with law.

Furthermore, if we turn from the oral testimony to the internal evidence furnished by the powers themselves, it must be seen on their very faces that separate sales were contemplated. For instance, as to the upland plaintiffs were to have $40 per acre net, but they agreed not to price these lands to any party "furnished by Allen" at less than $45 per acre. They agreed, furthermore, to accept a cash payment of not less than $2,000 in case of a sale of the upland. When we come to the lowlands, part of them were to net the owners $19 an acre. Part of them were to net the owners $25 an acre, and, what is more to the point, in case of a sale of part of the lowlands, the owners were to accept $1,000 cash payment; and in case of a sale of all the lowlands they were to accept $2,000 cash payment, and they bound themselves to price the lowlands to any party furnished by Allen at not less then $25 per acre. Aside, then, from any presumption that these written instruments included the whole contract of agency, it is in-

conceivable they should be read over and signed with the foregoing written provisions therein, if the ultimate understanding arrived at was that the land should be sold *en bloc* or all at the same time.

In view of the foregoing, if it should be conceded to plaintiffs that by mere loose talks they expressed desire that the lowland should help sell the upland, and *vice versa,* and that their wish was to close out all the lands or none, yet when they made Allen the donee of the powers in Exhibits A and B, allowing him to come in contact with third parties armed with such powers, it can not be permitted that they may avoid his acts because of unexpressed and unwritten wishes and desires. Conceding that a third party is put upon inquiry as to the powers of an agent to sell real estate, and conceding that he must deal with the agent with the power before him, or presumably before him, yet the rule laid down by Mechem (Mechem on Agency, sec. 278) is sensible, and to the effect that, "What third persons are interested in, is, not the secret processes of the principal's mind, but the visible result of those processes— the character in which the agent is held out by the principal to those who may have occasion or opportunity to deal with him. This character is a tangible, discernible thing, and, so far as third persons are concerned, must be held to be the authorized, as it is the only expression and evidence from which the principal intends that they shall determine his purposes and objects."

We have laid no controlling stress on the significant facts that, at the commencement of the controversy, plaintiffs bottomed their refusal to perform on the fact that they had been offered more money in April, on the fact that some improvements had been made, on the fact that Mrs. Kilpatrick refused to sign the deed, and only afterwards directly questioned the authority of Allen to sell the upland separately from the lowland; and we end the present matter by saying

that, in our opinion, the contention in hand must be ruled against plaintiffs.

(c)  But it is claimed by plaintiffs that they revoked the power donated Allen by Exhibit A. By its terms the power is irrevocable for six months. However, the donor of a power not coupled with an interest in the very subject-matter itself may revoke the same, he may recall his appointment. [State ex rel. v. Walker, 88 Mo. l. c. 284.] His right or power to revoke an unexecuted power can not be questioned by third parties. As to the agent, the principal's *power* to revoke is one thing and his *right* to revoke, in breach of the terms of the contract, is another, and such revocation may subject the principal to damages at the suit of the agent. No question of damages, however, is in this case. Allen is made a party defendant by plaintiffs' bill. He appears and joins his co-defendants in a defense, and here he and they contend the power of attorney, Exhibit A, was not revoked prior to its execution. Revocation is affirmative matter and the burden of proof was on plaintiffs to show a revocation. Plaintiffs' bill may be searched in vain for an averment relating to revocation. It is true the bill asserts the contract was made without authority. Now, revocation assumes authority once existed, and if plaintiffs were striking at a revocation in pleading want of authority to make the contract, the bill should have proceeded by proper averment to allege an original authority and a revocation thereof prior to the sale. In the absence of such averment it is questionable whether the issue of revocation could properly get into the case. But conceding it in the case, the court found the power was revoked and the question here is, is that finding right? We are constrained to think otherwise. A power to sell may be revoked by a sale of the subject-matter by the donor of the power, or a sale by another agent—by death, by express revocation, or by the performance of some act re-

sulting in its revocation by necessary implication. Un-
der given circumstances, notice of revocation to third
parties dealing with the agent is necessary. Under given
circumstances, notice to the agent himself is necessary.
Plaintiffs granted no power to Allen to appoint sub-
agents. They repudiate the power of Englehart and
Bryan as sub-agents to bind them. Conceding, without
deciding, that under such circumstances mere notice to
Englehart or Bryan was notice to Allen (a questionable
proposition under the reasoning of Nichols, Shepherd &
Co. v. Larkin, 79 Mo. l. c. 272), let it be sufficient to say
that in our opinion, on any theory of the law, under the
facts in judgment hereinbefore fully set forth, there
was no revocation by plaintiffs of the powers conferred
by Exhibit A until after the contract of sale was en-
tered into and recorded, if at all.

(d) It is finally contended by plaintiffs that, con-
ceding power was given as contended by defendants,
conceding it had not been revoked, yet the contract of
sale made and recorded was in excess of that power
and, therefore, void. In considering this contention, it
may be said that it is only by grace it is lodged in the
case. As said, the bill alleged the contract was made
without authority. The proof was mainly directed to
show that Exhibits A and B did not express the full
contract of agency, and was directed, furthermore, to
casting doubt on the signatures of plaintiffs to the con-
tract of agency. So that, we now have a case where,
first, relief is asked because the signatures are question-
ed; next, it is asked because the contract of agency is
said to have omitted a material provision (and that
omitted provision was violated); then, it is asked be-
cause the contract of agency is said to have been re-
voked, and, finally, because the contract of sale was in
excess of the power—and all this with no averment,
specifically and plainly directed to a single one of such
vital matters, appearing in the bill.

The specific grounds of this attack were leveled at,

first, the provision of the contract of sale allowing the buyer a rebate of 6 per cent on the advance payment from the date of the payment to March 1st, 1903; second, the contract provision binding the seller to pay $20 on the examination of the abstract of title to the land; and, third, the provision making time of the essence of the contract. And the insistence is made that none of these provisions are within the powers donated in Exhibit A.

Of the foregoing insistences, it may be said that every man has the right to decide for himself how his business shall be conducted. [Nesbitt v. Helser, 49 Mo. l. c. 384.] To the extent the power is expressed it is exclusive of every other main power. The essential character of the authority conferred can not be changed. [Mechem on Agency, sec. 273.] A substantial variance will defeat the agent's right to compensation. [Gelatt v. Ridge, 117 Mo. l. c. 561.] So, too, a substantial variance from the power will avoid the contract between the principal and a third party. [State v. Bank, 45 Mo. l. c. 538.] See, also, Secret Service Co. v. Gill Mfg. Co., 125 Mo. l. c. 156, in which it was held that a substantial compliance met the requirement of equity in specific performance.

However, in construing powers it has been well said (Tiffany on Agency, p. 169): " 'The object of the parties is to be kept in view, and when the language used will permit, that construction should be adopted which will carry out instead of defeating the purpose of the appointment.' For this reason, with formal powers as well as informal powers, the grant of authority must be construed to include all medium powers which are necessary to the effective execution of the authority granted."

In Holladay v. Daily, 86 U. S. 610, speaking to the point, Justice FIELD said for the Supreme Court of the United States: "Undoubtedly it is a rule that a special power of attorney is to be strictly construed, so as

to sanction only such acts as are clearly within its terms; but it is also a rule of equal potency that the object of the parties is always to be kept in view, and where the language used will permit, that construction should be adopted which will carry out, instead of defeating, the purpose of the appointment.''

In a late work (1 Clark & Skyles on the Law of Agency, pp. 498-500) it is said: ''In the absence of some fact or circumstance to the contrary, every express power carries with it, as an incident, all the powers which are necessary, proper, usual and reasonable, as a means of effectuating the purposes for which the original power was conferred. This principle is founded on the manifest intention of the party conferring such authority, and is in furtherance of such intention. And the rule applies alike to both general and special agents, unless the agent's power expressly provides the manner in which the particular act shall be done. Whatever attributes properly belong to the character bestowed will be presumed to exist, and they cannot be cut off by private instructions of which those who deal with the agent are ignorant. Among those attributes is the power to do all that is usual and necessary to accomplish the object for which the agency was created.''

Exhibit A conferred the following power: ''We . . . authorize Sidney P. Allen . . . to sell the following described real estate . . . and to make contract therefor in my name, subject to the conditions hereinafter named.'' In considering the present contention of plaintiffs in connection with the foregoing power and the foregoing general principles of law, defendants take the following positions: In the first place, they say that the court made no finding that the contract was void as in excess of the power. In the second place, they say no such point was made below, and that the case was not tried, nor did it ride off, on that theory. In the third place, they say the compliance with the power in the contract of sale was well enough.

We sympathize with the views of defendants. The present contention is raised for the first time on appeal, and was not presented or considered below. It is axiomatic that in an appellate court the cause should be reheard on the same theory it was heard *nisi*. Parties are usually held bound on appeal by positions taken in the trial court. [Chinn v. Naylor, 182 Mo. 583; Hall v. Goodnight, 138 Mo. 589; Walker v. Owen, 79 Mo. 583; 8 Ency. Pl. & Prac., 157; see, also, Foster v. Bowman, 55 Ia. 239; Van Namee v. Groot, 40 Vt. 74; Denny v. Wickliffe, 58 Ky. 224; McGahan v. Bank of Rondout, 156 U. S. 232; Planters Bank v. Whittle, 78 Va. 737—an illuminating case.] Furthermore, the power provides the sellers were "to accept all (or not less than $2,000) cash and balance Mch. 1, 1903, *as when purchaser takes possession,*" and further provides for possession on March 1st, 1903. The phrasing is somewhat awkward, but susceptible of a construction that in the contingency of payment of all or not less than $2,000 in advance of March 1st, 1903, then, since possession was fixed as of that date, the payment was to be made *as of that date.* In this view, to pay money in advance of a fixed date (as of that date) would admit of the theory that present value was to be computed, and that allowance should be made for the use of the money *ad interim.*

It may also be said of the present contentions, that power having been given to Allen to make a contract of sale and the body of such contract not having been set forth in the power, it follows that he had power to insert all usual and reasonable terms and provisions to accomplish the object aimed at. We are not prepared to say that all of the provisions objected to are not the usual and reasonable provisions in a contract drawn with particularity and relating to the sale of real estate; and of the provision making time of the essence of the contract, it may further be said that in equity such provision is of small significance. [Scan-

nell v. Soda Fountain Co., 161 Mo. l. c. 621, et seq.] But we prefer our conclusion to stand upon the proposition that the case was not tried below on the theory now presented and pressed by plaintiffs.

III. In equity it is a good ground of defense against specific performance that the bargain was a biting one, hard or unconscionable, and that such decree would produce manifest injustice. [Old Colony Railroad v. Evans, 72 Mass. (6 Gray) l. c. 36; Evans v. Evans, 196 Mo. 1.] We find no such obstacle in the way of specific performance in this case. Moreover, there being an absence of overreaching conduct, surprise, artifice or other form of fraud and imposition and an absence of accident or mutual mistake, and as courts of equity do not sit to forfeit, but to enforce, contracts fair and just, it is our opinion, the contract should be specifically enforced. And, as plaintiffs voluntarily joined Allen as a defendant and as issue is joined upon his right to compensation, to avoid a multiplicity of suits, Allen should have judgment for his commission at $4 per acre.

There being no evidence on the condition of Lisle and Kilpatrick's title, and no satisfactory evidence on the question of the rental value of the land from year to year, and no evidence relating to the payment of taxes and insurance, this cause is reversed and remanded to hear evidence on the questions of title, rental values and the payment of taxes and insurance. If the title be found marketable, a decree must be entered that plaintiffs convey the real estate in question, free from all existing liens and encumbrances, to defendants Wiley and Dungan by warranty deed; or, in lieu thereof, that the title be vested out of plaintiffs and into Wiley and Dungan. If plaintiffs be married and their wives, or either of them, refuse to join in a conveyance, then testimony should be heard on their ages to ascertain by tables the present worth of their dower interests and, in that event, the purchase price should be

diminished thereby, provided Wiley and Dungan are willing to accept specific performance in that form with compensation for outstanding dower. It should be further decreed that Allen at once deposit in court the $3,000, held by him, less his commission for making the sale, and that Wiley and Dungan deposit the balance of the purchase money in court for the use of plaintiffs without interest (tender having been proved). An accounting should also be taken of rents and profits from March 1st, 1903, and if the title be found in a condition to warrant a decree of specific performance, then, in that event, Wiley and Dungan should also have judgment for such rents and profits, less taxes and insurance, if any, paid by plaintiffs.

If, however, the title should not be in a condition to decree specific performance, then, in that event, Wiley and Dungan should be decreed compensation in damages for the loss of their bargain in the difference between the purchase price—$44 per acre, and the market value of the land at the date of the breach of the contract; and recover the advance payment of $3000, to-wit, from Allen what remains after his commissions are deducted and from Lisle and Kilpatrick enough to make up the amount; and it is our direction that the chancellor also hear further testimony on such market value, and decree the cost against plaintiffs.

Reversed and remanded to be proceeded with as herein directed. All concur.