ESTATE OF MYRTLE M. SAWADE, DECEASED, LOUISE C. (DEWEY) HORNSTEIN, EXECUTOR; MYRTLE M. SAWADE REVOCABLE LIVING TRUST (executed May 17, 1977), LOUISE C. (DEWEY) HORNSTEIN, TRUSTEE, AS TRANSFEREE; DINAN E. HORNSTEIN, KATHLEEN H. RIVERO, AND LOUISE C. (DEWEY) HORNSTEIN A/K/A DEWEY C. HORNSTEIN, AS TRANSFEREES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Sawade v. Commissioner
Docket No. 23656-82.
United States Tax Court
T.C. Memo 1984-626; 1984 Tax Ct. Memo LEXIS 50; 49 T.C.M. (CCH) 214; T.C.M. (RIA) 84626; December 3, 1984. John L. Sullivan, for the petitioners. James A. Kutten, for the respondent. KORNER MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined a deficiency in the Federal estate tax of the Estate of Myrtle M. Sawade, against the Myrtle M. Sawade Revocable Trust, and against the Trust remaindermen as transferees in the amount of $131,216.37. After concessions, the issues for decision are: (1) Whether the distribution of 19,910 shares of Baldor Electric Company stock to the beneficiaries *52 of the Myrtle M. Sawade Revocable Living Trust occurred (thus fixing their valuation date), within the meaning of section 2032(a), [1] when the successor trustee instructed her stockbroker to effect the transfer, or when the shares were transferred on the corporation's books; (2) whether petitioners are entitled to a blockage discount for certain shares of Baldor Electric Company. If yes, whether the blocks consist of two blocks of 19,910 and 9,540 shares, or of four blocks of 6,637, 6,637, 6,636 and 9,540 shares; (3) whether the valuation of three certificates of deposit should include the accrued interest thereon; and (4) whether the estate properly valued 320 acres of real estate in Fergus County, Montana. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner Louise C. (Dewey) Hornstein is the Executrix of the Estate of Myrtle *53 M. Sawade (hereinafter the "Estate"), and successor trustee of the Myrtle M. Sawade Revocable Living Trust (hereinafter the "Trust"). She resided in St. Louis, Missouri, at the time the petition in this case was filed. Petitioners Dinan E. Hornstein and Kathleen H. Rivero resided in St. Louis, Missouri, and Miami, Florida, respectively, at the time the petition was filed. I.
On May 19, 1977, Myrtle M. Sawade, as grantor, created the Trust. The Trust document provided that the grantor was to retain the lifetime right to the income of the Trust. The grantor appointed her sister, Louise C. (Dewey) Hornstein, as successor trustee. The Trust document provided that, upon the grantor's death, the successor trustee was authorized, in her sole discretion, to expend such sums of the principal of the Trust's estate as she deemed proper to pay the following expenses of Myrtle M. Sawade: (1) Expenses of her last illness and funeral; (2) debts; (3) expenses of administration of her estate; and (4) all taxes, including Federal estate taxes. All actions of the successor trustee in the exercise of the above-mentioned powers were to be conclusive and binding on all parties in *54 interest. The document provided, further, that all other provisions providing for the distribution of trust property after the death of the grantor were subject to the right of the successor trustee to withhold, in whole or in part, such transfer of assets pending a determination by her of the actions to be taken regarding the payment of the expenses. The beneficiaries, other than the grantor, had no power to assign, transfer, encumber or otherwise anticipate or dispose of any interest, either principal or income, they may have had in the property held in the trust estate. Any such assignment, transfer, encumbrance or other attempted anticipation or disposition was to be void and of no effect. The remaining trust property after the payment of the expenses, was to be transferred to the remaindermen: Louise C. (Dewey) Hornstein, Dinan E. Hornstein, and Kathleen H. Rivero, free of trust. The grantor reserved the right to revoke the trust during her lifetime. Myrtle M. Sawade (hereinafter the "decedent") died on October 10, 1978, in St. Louis, Missouri, without having revoked the Trust. Louise C. (Dewey) Hornstein, Dinan E. Hornstein, Kathleen H. Rivero, and the decedent *55 each maintained separate brokerage accounts at Newhard, Cook, and Company (hereinafter "Newhard") in St. Louis, Missouri. After her death, Myrtle M. Sawade's account became the account for the Trust. On October 26, 1978, an inventory was taken of the items contained in safe deposit box number 1830 in decedent's name at the Chippewa Bank, formerly Chippewa Trust Company, in St. Louis, Missouri. Amongst the items contained therein were Baldor Electric Company (hereinafter "Baldor") stock certificates number S932 and CU6721, representing ownership of 20,204 and 19,910 shares, respectively, owned by the Trust. On the same day, the two Baldor stock certificates, totaling 40,114 shares, were handed to John P. Cummings, a stockbroker employed by Newhard, who deposited them in the Trust's account. The following letter was executed on October 30, 1978, by Louise C. (Dewey) Hornstein, as successor trustee, and hand delivered to John P. Cummings on the same day: Mr. John P. Cummings, Vice-President, Newhard, Cook & Co., 300 North Broadway, St. Louis, Missouri 63102 Re: Trust Estate of Myrtle Sawade
Dear Mr. Cummings: I have heretofore delivered to you as my agent *56 two certificates representing ownership of the trust estate in Baldor Electric Company, being Certificate No. CU6721 for 19,910 shares and Certificate No. S932 for 20,204 shares. Please accept this letter, which I have personally dated, as my irrevocable instructions to you, as the Successor Trustee of the trust estate of Myrtle Sawade, to effect delivery of 19,910 shares of Baldor Electric Company stock now held by you as my agent to the following persons in the shares indicated: To Dewey C. Hornstein
SS#489-09-2618
10 Plaza Square
Apt. 314
St. Louis, Mo., 63103
6,636 shares
To Kathleen H. Rivero
SS#357-16-7742
1408 S. E. Bayshore Dr.
Apt. 1204
Miami, Florida 33131
6,637 shares
To Dinan E. Hornstein
SS#498-01-6455
1809 Wyoming Street
St. Louis, Mo., 63118
6,637 shares
Very truly yours, /s/ Louis C. (Dewey) Hornstein Dated: October 30, 1978 On November 13, 1978, Louise C. (Dewey) Hornstein executed a stock assignment (stock power of attorney) to Newhard in blank (as to the distributees) for Baldor stock certificates number S932 and CU6721 as "Louise C. Hornstein, Successor Trustee." Newhard sent a letter, dated November 14, 1978, to *57 the Stock Transfer Department of Mercantile Trust Company (hereinafter "Mercantile") in St. Louis, Missouri, the stock transfer agent for Baldor, requesting that it transfer the 40,114 shares owned by the Trust as follows: (a) Stock certificate number CU6721 was to be distributed between Louise C. (Dewey) Hornstein, Kathleen H. Rivero, and Dinan E. Hornstein. New stock certificates were to be issued; Louise C. (Dewey) Hornstein was to receive 6,636 shares of stock, Kathleen H. Rivero was to receive 6,637 shares of stock, and Dinan E. Hornstein was to receive 6,637 shares of stock. (b) The 20,204 shares of Baldor stock, represented by stock certificate number S932, were to be reregistered in the name of "Louise C. Hornstein, Successor Tstee. U/A Dtd. 5/17/77 M/B Myrtle M. Sawade." The Stock Transfer Department of Mercantile returned the stock certificates to Newhard on November 16, 1978, stating that the certificates were returned without the requested action being performed since an inheritance tax waiver from the State of Missouri was needed before Mercantile would process the requested transfer. On December 19, 1978, Newhard sent a letter to the Stock Transfer *58 Department of Mercantile requesting that the 40,114 shares of Baldor owned by the Trust be transferred in an identical manner as set forth in Newhard's directions in their November 14, 1978 letter to Mercantile. Newhard's November 19, 1978 letter included a Missouri inheritance tax waiver. The shares were transferred on the books of the corporation, according to Newhard's directions, on December 20, 1978. The corresponding reregistered stock certificates were sent to Newhard and transferred out of the Trust's account and into the individual brokerage accounts of Louise C. (Dewey) Hornstein, Dinan E. Hornstein and Kathleen H. Rivero, to the extent of 19,910 shares; the remaining 20,204 shares went into the Trust's account. The Estate timely elected to value all the property included in the gross estate under the alternate valuation method in section 2032. The 19,910 shares of Baldor stock represented by stock certificate number CU6721 were valued as of October 30, 1978, the date on which Louise C. (Dewey) Hornstein, acting as successor trustee, executed the letter instructing Newhard to effect delivery of the Baldor stock to the remaindermen. Respondent determined that the shares *59 of Baldor stock transferred to the three individual distributees during the six-month alternate valuation period should have been valued on December 20, 1978, the date the stock was transferred on the books of the corporation by the stock transfer agent, and increased the taxable estate by $117,164.38, due to the difference in the value of the stock on that date, as compared to October 30, 1978. II.
On or about June 3, 1977, Myrtle M. Sawade transferred 157 shares apiece of Baldor stock as a gift to Louise C. (Dewey) Hornstein, Dinan E. Hornstein, and Kathleen H. Rivero, for a total of 471 shares. In May 1978, the stock of Baldor split two-for-one. On or about September 6, 1978, Myrtle M. Sawade transferred 98 shares of Baldor stock to each of the above-mentioned donees, for a total of 294 shares. None of the above shares were sold or otherwise disposed of by the respective donees prior to April 10, 1979. The Trust sold 11,900 shares of Baldor stock in 41 separate sale transactions during the six-month alternate valuation period, and 3,504 shares thereafter. The following chart reflects the date, number of shares and price per share of the shares sold by the *60 Trust. The chart also reflects the market volume, high, low, and closing price for the corresponding sale dates: Summary of Sawade
Market Performance During
Trust Sales
Corresponding Sale Dates
Number
Price
of shares
per
Sale Date
sold
share
Volume
High
Low
Close
1/31/1979
100
$26    6,200
26 1/2
26    26    1/31/1979
1,600
26 1/2
6,200
26 1/2
26    26    2/1/1979
500
26    1,300
26    25 1/2
25 1/2
2/12/1979
1,100
24    3,700
24 1/2
24    24 3/8
2/16/1979
1,500
24    3,100
24 3/8
24    24 3/8
2/16/1979
800
24 1/8
3,000
24 3/8
24    24 3/8
2/16/1979
100
24 3/8
3,000
24 3/8
24    24 3/8
2/20/1979
200
24 1/2
6,300
24 5/8
24    24 3/8
2/20/1979
200
24 5/8
6,300
24 5/8
24    24 3/8
2/21/1979
1,000
24 5/8
5,400
25 1/4
24 1/8
25 1/8
2/21/1979
1,000
25    5,400
25 1/4
24 1/8
25 1/8
2/21/1979
400
25 1/4
5,400
25 1/4
24 1/8
25 1/8
2/22/1979
500
25    2,700
25    24 5/8
25    2/28/1979
500
25    1,000
25    24 3/4
24 3/4
3/5/1979
400
25    1,000
25    24 3/4
25    3/6/1979
100
25 1/4
1,900
25 1/4
24 7/8
25    3/7/1979
500
25    1,100
25 1/4
25    25 1/4
3/7/1979
400
25 1/4
1,100
25 1/4
25    25 1/4
3/8/1979
500
25 1/4
1,100
25 1/2
25 1/4
25 1/2
3/9/1979
500
25 1/2
4,100
25 5/8
25 1/8
25 1/4
Subtotal
[2] 11,900
4/11/1979
500
31 1/4
1,300
31 3/8
31    31    4/12/1979
500
30 1/2
2,800
30 1/2
30 1/8
30 1/4
4/19/1979
500
29 1/8
1,100
29 1/4
29    29    4/20/1979
500
29    2,200
29 1/4
28 1/2
28 5/8
4/27/1979
500
28    600
28 1/4
28    28 1/8
5/2/1979
500
28 3/8
800
28 3/8
28 3/8
28 3/8
5/3/1979
4
28 1/8
5,000
28 3/8
28    28 1/4
5/3/1979
500
28 1/4
5,000
28 3/8
28    28 1/4
Subtotal
[3] 3,504
Grand total
15,404
*61 The gross estate of Myrtle M. Sawade thus included: (a) 1,236 shares that were transferred by the decedent without consideration during the three-year period ending on the date of her death, under section 2035. These 1,236 shares consisted of 471 shares transferred on June 3, 1977, subsequently split two-for-one, and the September 6, 1978 transfer of 294 shares; and are to be valued as of April 10, 1979.[4]
(b) Also included in the gross estate were 11,900 shares of Baldor stock that were sold by the Trust during the alternate valuation period in 41 separate transactions; these shares are to be valued at each sale's respective price under section 2032(a)(1).[5]
(c) The gross estate also included 19,910 shares of Baldor stock transferred to the Trust remaindermen as described above. [6]
(d) The gross estate further included 8,304 shares of Baldor stock that were not disposed of during the six-month alternate valuation period. These shares are to be valued at the end of *62 said six-month period, April 10, 1979, under section 2032(a)(2). [7] Baldor stock was traded on the American Stock Exchange during the Years 1978 and 1979. The following chart reflects the weekly volume of Baldor stock traded during 1978: Week ended
Volume
1978
1/6
11,300
1/13
16,600
1/20
5,400
1/27
3,600
2/3
2,600
2/10
12,400
2/17
2,800
[8] 2/24 2,300
3/3
2,800
3/10
9,200
3/17
16,100
[9] 3/24 2,600
3/31
3,700
4/7
5,800
4/14
15,700
4/21
4,700
4/28
17,600
5/5
19,900
5/12
16,700
5/19
7,700
5/26
7,300
[10] 6/2 3,700
6/9
33,400
6/16
26,100
6/23
17,500
6/30
5,900
7/7
5,900
7/14
11,800
7/21
9,400
7/28
12,100
8/4
23,500
8/11
20,100
8/18
7,800
8/25
11,700
9/1
15,700
[11] 9/8 7,800
9/15
16,600
9/22
18,500
9/29
6,400
10/6
13,200
10/13
11,200
10/20
39,800
10/27
16,000
11/3
38,300
11/10
11,000
11/17
16,700
[12] 11/24 11,000
12/1
9,300
12/8
15,700
12/15
9,400
12/22
22,800
12/29
17,700
*63 A total of 682,500 shares of Baldor stock were traded during 1978. The following chart illustrates the weekly volume of Baldor stock traded during 1979: Week ended
Volume
1979
1/5
9,600
1/12
12,700
1/19
11,600
1/26
5,000
2/2
12,100
2/9
5,700
2/16
9,900
[13] 2/23 16,600
3/2
5,400
3/9
9,200
3/16
7,900
3/23
6,000
3/30
17,700
4/6
15,600
[14] 4/13 11,300
4/20
8,500
4/27
9,800
5/4
15,000
5/11
12,600
5/18
9,300
5/25
24,900
[15] 6/1 27,300
6/8
9,500
6/15
20,400
6/22
10,300
6/29
15,100
[16] 7/6 14,600
7/13
15,500
7/20
6,000
7/27
6,400
8/3
26,800
8/10
5,700
8/17
9,000
8/24
16,900
8/31
10,600
[17] 9/7 3,900
9/14
4,600
9/21
5,600
9/28
31,900
10/5
24,600
10/12
30,100
10/19
35,500
10/26
18,400
11/2
67,600
11/9
13,200
11/16
20,300
[18] 11/23 7,100
11/30
11,700
12/7
14,600
12/14
12,700
12/21
20,100
12/28
2,700
12/31
1,100
*64 A total of 756,200 shares of Baldor stock were traded in 1979. The monthly number of shares of Baldor stock traded, and the monthly high and low prices for the years 1978 and 1979 were as follows: 1978
Volume
High
Low
January
37,100
26 3/4
21 1/8
February
22,000
26 7/8
24 5/8
March
32,300
29 5/8
25 3/4
April
43,800
33 7/8
28 5/8
May
54,800
39 1/2
34     June
93,100
39     19 1/2
[19] July 44,200
26     20 1/8
August
72,700
32 7/8
25 3/8
Septemer
50,400
34     29 1/8
October
101,500
32 1/4
20 3/4
November
63,200
26     20 3/4
December
67,400
28 1/4
22 1/2
1979
Volume
High
Low
[20] January 45,800
26 3/4
23 1/2
[21] February 41,000
26     24     [22] March 42,600
29 3/8
24 3/4
[23] April 48,500
3 3/8
28     [24] May 82,600
30 3/4
25     June
58,500
30 7/8
29     July
66,900
30 3/8
27 3/4
August
44,600
32 1/4
27 1/2
[25] September 46,000
31 1/2
21 1/4
October
142,900
24 3/8
17 1/2
November
85,600
18 3/4
17 1/4
[26] December 51,200
20 1/2
18 1/4
*65 On December 20, 1978, the mean between the highest and lowest selling prices was $25,1875. [27] The mean between the highest and lowest quoted selling prices was $30.875 on April 10, 1979. [28]
Petitioners valued the 19,910 shares of Baldor stock represented by stock certificate *66 number CU6721 as of October 30, 1978, the date on which the successor trustee hand delivered the letter to her broker instructing him to effect delivery of the shares to the remaindermen. The shares were valued at $19,3125 per share, [29] for a total of $384,318.75. The 8,304 shares of Baldor stock that were not disposed of at the end of the six-month alternate valuation period were valued as of this date, April 10, 1979, at $28.375 per share, [30] for a total of $235,626. *67 Respondent determined that the appropriate valuation date for the 19,910 shares that were transferred to the remaindermen was December 20, 1978, the date on which the shares were transferred on the books of the issuing corporation. Respondent also determined that the appropriate value was the mean between the highest and lowest selling price on December 20, 1978, $25.1875, for a total of $501,483.13. Respondent accordingly increased the taxable estate by $117,164.38. Respondent agreed with petitioners that the 8,304 shares that were in the Estate at the end of the alternate valuation period were to be valued as of April 10, 1979. Respondent determined that the value of each share of Baldor stock on April 10, 1979, was $30.875, the mean between the highest and lowest selling price on that date, for a total of $256,386. Respondent accordingly increased the taxable estate by $20,760. [31]
*68 III.
Decedent held three certificates of deposit at the Chippewa Bank, each with a face value of $10,000. At the time of her death the accrued, but unpaid, interest on all three certificates of deposit was $56.28. A certificate of deposit at the Chippewa Bank may be cashed in before maturity, but a penalty of six month's interest is applied. If the owner of a certificate of deposit dies, however, the estate can either cash in the certificate of deposit, without penalty, and receive the face value of the certificate plus the entire accrued interest, or roll over the certificate of deposit into a new certificate issued in the name of the estate or an heir, without penalty. IV.
At the time of her death, the decedent owned 320 acres of real estate in Fergus County, Montana. There were no structures on the property. In Montana, property is classified and valued by the local government (and by private appraisers) according to its highest and best use. The highest and best use of the instant real estate is for grazing. Grazing land is classified by Fergus County numerically 1G through 6G, according to the average inches of yearly rainfall, type of vegetation *69 that grows on it, quality of the soil, and water rights. Class 1G is the best and 6G is the worst; 6G is practically desert. The real estate in issue is classified 4G, which is considered very poor land; only sparse grass and a lot of sage brush can be found on it. Approximately 50 acres of 4G grazing land are required to support an animal for about four months. There are no streams running through the property, nor are there any wells on the property, and no water rights exist. The average annual precipitation in the area is 10 inches of rainfall. Several ranchers in Fergus County have built small dams in ditches to catch rainfall runoff, thus creating a small reservoir. No such dams can be constructed on the instant land, as there is no creek to dam up, and the land is flat. The nearest road leading to the property is a dirt trail about two or three miles away. The nearest paved road is west of the property, at a place called Bohemian Corners, twenty miles away. To get to the decedent's property one has to take a gravel road from Bohemian Corners, to a ranch owned by one Stier, and cut across his property. The Sawade property has no right of way over Stier's *70 property. Roy, Montana, the nearest town, is approximately twenty-eight miles away. Most of the land surrounding the property belongs to the Crooked Creek State Grazing Cooperative, a semi-governmental agency that leases grazing rights to its members. The other two properties adjoining the instant land belong to private persons. The total assessed value of the property (for local tax purposes) was $805, approximately $2.52 an acre, in 1978, and $806 in 1983. Petitioners relied on an expert appraisal valuing the land at $50 an acre, or $16,000 total, in including the value of the land as part of the gross estate at the alternate valuation date. Respondent determined in his statutory notice of deficiency that the fair market value of the real estate was $70 an acre on April 10, 1979, and correspondingly increased the taxable estate by $6,400. ULTIMATE FINDINGS OF FACT 1. The alternate valuation date for 19,910 shares of decedent's stock in Baldor is December 20, 1978, the date on which the shares were transferred on the books of the issuing corporation. 2. The value of 19,910 shares of decedent's Baldor stock which are to be valued at December 20, 1978, is *71 $25.1875 per share. The value of 9,540 shares of said stock which are to be valued at April 10, 1979, is $30.875 per share. 3. The value, includable in the gross estate, of decedent's three certificates of deposit includes the accrued interest thereon. 4. The fair market value of decedent's 320 acres of grazing land located in Fergus County, Montana, was $16,000 at the alternate valuation date. OPINION I.
The alternate valuation date issue
The Estate elected to value the gross estate under the alternate valuation method of section 2032. [32] Section 2032 provides in pertinent part: SEC. 2032. ALTERNATE VALUATION. (a) General.--The value of the gross estate may be determined, if the executor so elects, by valuing all the property included in the gross estate as follows: (1) In the case of property distributed, sold, exchanged, or otherwise disposed of, within 6 months after the decedent's death such property shall be valued as of the date of distribution, sale, exchange, or other disposition. (2) In the case of property not distributed, sold, exchanged, or otherwise disposed of, within 6 months after the decedent's death such property shall *72 be valued as of the date 6 months after the decedent's death. * * * The phrase "distributed, sold, exchanged, or otherwise disposed of" comprehends all possible ways by which property ceases to form a part of the gross estate. Section 20.2032-1(c)(1), Estate Tax Regs. The term "distributed" means that first to occur of the following: (i) The entry of an order or decree of distribution, if the order or decree subsequently becomes final; (ii) The segregation or separation of the property from the estate or trust so that it becomes unqualifiedly subject to the demand or disposition of the distributee; or (iii) The actual paying over or delivery of the property to the distributee. Section 20.2032-1(c)(2), Estate Tax Regs. The issue for resolution is whether a segregation or separation of 19,910 shares of Baldor stock from the Trust occurred, so that they became unqualifiedly subject to the demand or disposition of the distributees, when the successor trustee hand delivered a letter to Mr. Cummings instructing him to effect delivery *73 of the shares to the distributees. [33]
In Hertsche v. United States,244 F.Supp. 347 (D. Or. 1965), affd. per curiam, 366 F.2d 93 (9th Cir. 1966), the District Court held that the value of some shares of stock distributed by the executor pursuant to a probate court order was determinable as of the date of the order directing distribution, not the date of physical delivery. The validity of section 20.2032-1(c) was upheld. In interpreting the word "distributed" as used in section 2032(a)(1), the District Court stated: The shifting of the economic benefits of the property rather than the formal delivery is sufficient for the purposes of taxation. [Hertsche,244 F.Supp. at 350.] In Estate of Prell v. Commissioner,48 T.C. 67 (1967) the executors of the estate assigned and delivered certain shares of stock to the residuary legatees on August 9, 1960. On the same day the legatees signed receipts for the stock and the stock certificates were delivered to a local stock brokerage house for forwarding to the issuing corporation so that the ownership of *74 the shares of stock could be transferred on the corporation's books. On August 15, 1960, the corporation transferred the ownership of the shares on its stock transfer books and issued new stock certificates to the legatees. Under Ohio probate law, an executor could not distribute the assets of the estate until certain conditions were met, one of which was the expiration of six months from the date of the executor's appointment. The executors argued that the first date that the stock could have been legally delivered to the legatees, October 5, 1960, was the appropriate date for alternate valuation purposes. In rejecting the taxpayer's argument, this Court noted that the Ohio statute was intended to protect claimants of the estate; there was no evidence that there were any present or prospective claimants of the estate. This Court cited Hertsche,supra, and held that the word "distribution," as used in section 2032 and as defined in section 20.2032-1, Income Tax Regs., relates to the shifting of the economic benefits of the property transferred, rather than to technicalities of state law. Estate of Prell v. Commissioner,48 T.C. at 70. The *75 alternate valuation date was held to be August 9, 1960, the date on which the stock was assigned and delivered to the legatees. The relevant question then becomes: When were the economic benefits of the Baldor Electric Company stock transferred to the Trust remaindermen in this case? Upon the death of the grantor-trustee, legal title to the trust properties passed to the successor trustee; the equitable title remained in the remaindermen. [34]Watson v. Hardwick,231 S.W. 964 (Mo. 1921); Gerland v. Smith,164 Mo. 1, 64 S.W. 188 (1901); McDaniel Title Co. v. Lemons,626 S.W.2d 686 (Mo. App. 1981); Penney v. White,594 S.W.2d 632 (Mo. App. 1980). The remaindermen's interest was not certain as to any specific dollar value or specific property; the trustee had the power, in her sole discretion, to expend the principal of the Trust to pay certain items. The actions of the trustee in exercise of this power would be conclusive and binding on the remaindermen. The remaindermen could not pursue an action in state court to compel the successor trustee to transfer the stock. The death of the decedent, therefore, *76 did not operate as a consolidation of the right to the economic benefits of the stock in the remaindermen. In her letter dated October 30, 1978, Louise C. (Dewey) Hornstein, acting as successor trustee, instructed John P. Cummings, a stockbroker at Newhard, "to effect delivery" of 19,910 shares of Baldor stock, held by him as her agent, meaning that delivery had not been completed and was to be completed in the future. Anaked contract of agency - that is, one not coupled with an interest - may be revoked by the principal at any time, at least before performance by the agent, thereby terminating the agent's authority to act in the principal's behalf. Chamberlain v. Grisham,360 Mo. 655, 230 S.W.2d 721 (1950); Berberet v. Myers,240 Mo. 58, 144 S.W. 824 (1912). This is so even if the agency agreement provides that the agency is irrevocable. Kilpatrick v. Wiley,197 Mo. 123, 95 S.W. 213 (1906). *77 The only exception to the rule is that a principal may not summarily revoke the authority of his agent in those cases where the agent has acquired with the authority conferred an interest in the subject matter of the agency. But an interest sufficient to render the agency irrevocable must be an interest in the thing itself or in the property which is the subject of the agency, and a mere interest in the results or proceeds of the execution of the authority as by way of compensation is not enough. Meyer v. Pulitzer Pub. Co.,156 Mo. App. 170, 136 S.W. 5 (1911). In any case where the agency is revoked by the principal, if it appears that the agent, induced by his appointment, has in good faith incurred expense and devoted time and labor in the matter of the agency without having had a sufficient opportunity to recoup from the undertaking, the principal will be required to compensate the agent. Want v. Century Supply Company,508 S.W.2d 515 (Mo. App. 1974). This is the agent's sole recourse. Clarkson v. Standard Brass Mfg. Co.,237 Mo. App. 1018, 170 S.W.2d 407 (1943). The right of the principal cannot otherwise be questioned. *78 Berberet,supra. Neither John P. Cummings nor Newhard had any interest in the 19,910 shares of Baldor stock. The statement in the October 30, 1978 letter to John P. Cummings that the instructions therein contained were irrevocable was ineffective under Missouri law. The above-mentioned letter did not constitute a distribution of the stock, as the successor trustee had the power to revoke her instructions at any time; she did not validly relinquish her right to transfer legal title of the stock to anyone other than the remaindermen. Missouri law is determinative of when a distribution occurred. [35] A purchase includes taking by gift or any other voluntary transaction creating an interest in property. Section 400.1-201(32), Mo. Ann. Stat. (Vernon 1965). The acts of the successor trustee seeking to transfer stock to the distributees are a voluntary transaction which can create an interest in property within the meaning of the statute. *79 The execution of a stock assignment to Newhard for the two stock certificates, by the successor trustee on November 13, 1978, did not constitute a transfer of the shares of stock. An endorsement of a security, whether special or in blank, does not constitute a transfer until delivery of the security on which it appears, or if the endorsement is on a separate document, until delivery of both the document and the security. Section 400.8-309, Mo. Ann. Stat. (Vernon 1965). Delivery requires that the security be "in form to be negotiated by the purchaser." Section 400.8-314 Mo. Ann. Stat. (Vernon 1965). Thus, it must be at least endorsed and "any other requisite which may be necessary to obtain registration of the transfer of the security," such as a Missouri inheritance tax waiver, satisfied. [36] Sections 400.8-316, 400.8-401, Mo. Ann. Stat. (Vernon 1965). Section 400.8-313(1) provides, in pertinent part, that delivery to a purchaser occurs when: (a) he or a person designated by him acquires possession of a security; or (b) his broker acquires possession of a security specially endorsed to or issued in the name of *80 the purchaser; or (c) his broker sends him confirmation of the purchase and also by book entry or otherwise identifies a specific security in the broker's possession as belonging to the purchaser; or (d) with respect to an identified security to be delivered while still in the possession of a third person when that person acknowledges that he holds for the purchaser; or (e) appropriate entries on the books of a clearing corporation are made under section 400.8-320. *81 We do not have here the situation described in section 400.8-313(1)(a), Mo. Ann. Stat. (Vernon 1965), since the remaindermen did not acquire possession of the stock prior to the transfer of the shares on the books of the issuing corporation, and Mr. Cummings was acting as an agent of the successor trustee when he obtained possession of the two stock certificates, not as the broker of the remaindermen. [37]Section 400.8-313(1)(b) is similarly not applicable here as the certificates obtained by the broker were not specifically endorsed in the name of the distributees, nor did he take possession as the broker of the transferees until the transaction was completed, when the shares were taken out of the Trust's account and into the individual transferees' accounts. Nor does section 400.8-313(1)(c) establish a date *82 of distribution, as the shares were never identified by Newhard as belonging to the remaindermen, but stayed in the Trust's account until they were reregistered in the names of the distributees and received by Newhard on December 29, 1978. Section 400.8-313(1)(d), Mo. Ann. Stat. (Vernon 1965), generally applies to margin trading, where the securities are pledged to secure the remainder of the purchase price not advanced by the purchaser. 3 Anderson, Uniform Commercial Code, 762 (1971). When Newhard received the reregistered stock certificates on December 29, 1978, it held the new certificates for the remaindermen, but this is not the delivery date, since the stock was earlier transferred on the books of the corporation. We hold that the Baldor stock was distributed to the remaindermen on December 20, 1978, the date on which the shares of stock were transferred on the books of the corporation. [38]
*83 Such date is accordingly to be used as the alternate valuation date for 19,910 shares of Baldor stock.[39]
*84 Petitioners argue that in Prell we held "the empty form of a receipt evidencing a momentary physical fact and not a true delivery of possession [to constitute a distribution under section 2032(a), and that this] should bolster the fact pattern of this case where the fiduciary took all possible steps within her control to effect distribution as of a specific date." In Prell,supra, the stock transfers were completed before the stock transfers were recorded on the stock transfer books of the issuing corporation. The distribution was completed upon the executor's endorsement of the shares and physical delivery of the stock certificates to the legatees, followed by the signing of receipts by the legatees acknowledging delivery therefor. The regulations clearly state that the actual delivery of the property to the distributees constitutes a distribution. Section 20.2032-1(c)(2)(iii), Estate Tax Regs. Neither the statute nor the regulations require that the distribution take any specified amount of time. There was no segregation or separation of the property here from the Trust prior to the transfer of the stock on the books of the corporation, *85 constituting delivery of the property to the remaindermen. On this issue we hold for respondent. II.
The blockage discount issue
The second issue for resolution is whether petitioners are entitled to a blockage discount in valuing the 19,910 shares of Baldor stock transferred to the remaindermen and the 9,540 shares that had not been disposed of on April 10, 1979; and if yes, whether section 2032 contemplates a transactional approach requiring that the distribution of 6,636 shares to Louise C. (Dewey) Hornstein; 6,637 shares to Dinan E. Hornstein; and 6,637 shares to Kathleen H. Rivero be considered as separate transactions for purposes of the blockage discount analysis. Petitioners' position is that the introduction of two blocks of stock consisting of 19,910 and 9,540 shares, respectively, into the market would have depressed the market price of the stock. This argument is based on the theory of blockage. Petitioners' expert, Elmer Jarret, a trader for Newhard, testified that a 1 to 1-1/2 point discount should be applicable for blocks of 19,910 and 9,540 shares on October 30, 1978, and April 10, 1979, respectively. Mr. Jarret's opinion on a blockage *86 discount was based upon the assumption that the entire amount of each block would be sold on the respective valuation dates, as if each entire block were dumped on the market in one transaction at one time on each valuation date. Mr. Jarret did not consider the alternative of disposing of the stock in small amounts over a reasonable period of time, nor was he aware of the number of Baldor shares outstanding. Respondent contends that a blockage discount is not proper and that the shares of Baldor stock should be valued at the mean between the highest and lowest selling prices on the respective valuation dates. Respondent argues that for purposes of our analysis, four different blocks of stock must be considered, consisting of: 6,636 shares transferred to Louise C. (Dewey) Hornstein; 6,637 shares transferred to Dinan E. Hornstein; 6,637 shares transferred to Kathleen H. Rivero; and 9,540 shares that had not been disposed of at the end of the alternate valuation period, on April 10, 1979. Respondent argues, in support of his contention, that section 2032 requires a transactional approach. When the executor elects the alternate valuation method in section 2032, the value of every *87 item of property includable in the decedent's gross estate is the fair market value thereof at the appropriate valuation date. Section 20.2031-1(b), Estate Tax Regs. Generally, if there is a market for stock, in a stock exchange, in an over-the-counter market, or otherwise, the mean between the highest and lowest quoted selling prices on the valuation date is the fair market value per share. Section 20.2031-2(b)(1), Estate Tax Regs.; Rogers v. Helvering,107 F.2d 394 (2d Cir. 1939), affg. 31 B.T.A. 994 (1935); Estate of Damon v. Commissioner,49 T.C. 108 (1967). Under certain circumstances, however, the value of a share of stock determined on the basis of selling or bid and asked prices does not reflect its fair market value. The size of the block of stock may be a factor to consider in determining whether the bid and asked prices reflect the fair market value of stock. Section 20.2031-2(e), Estate Tax Regs., explicitly recognizes this in providing that: * * * In certain exceptional cases, the size of the block of stock to be valued in relation to the number of shares changing hands in sales may be relevant in determining *88 whether selling prices reflect the fair market value of the block of stock to be valued. If the executor can show that the block of stock to be valued is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations. Complete data in support of any allowance claimed due to the size of the block of stock being valued shall be submitted with the return. On the other hand, if the block of stock to be valued represents a controlling interest, either actual or effective, in a going business, the price at which other lots change hands may have little relation to its true value. The reasoning on which this theory of valuation is based in that a large block of stock cannot ordinarily be marketed and turned into cash as readily as a few shares; also, that where there is only a limited market for a stock, offering a large block of the stock depresses the market and lowers the price that can be obtained. The conclusion that *89 flows from this premise is that evidence of sales of small blocks of stock is not a criterion of the value of a large block of the same stock. Phipps v. Commissioner,127 F.2d 214 (10th Cir. 1942), cert. denied 317 U.S. 645 (1942). Blockage is not a law of economics, a principle of law or a rule of evidence. If the value of a given number of shares is influenced by the size of the block, this is a matter of evidence and not of doctrinaire assumption. Safe Deposit & Trust Co. of Baltimore v. Commissioner,35 B.T.A. 259 (1937), affd. 95 F.2d 806 (4th Cir. 1938). Blockage is not a rule of law, but a question of fact. Estate of Christie v. Commissioner,T.C. Memo. 1974-95. There is no presumption of blockage. Maytag v. Commissioner,187 F.2d 962 (10th Cir. 1951). Only those shares remaining in the estate on the alternate valuation date are considered for blockage discount. Section 2032; Estate of Van Horne v. Commissioner,78 T.C. 728 (1982), affd. 720 F.2d 1114 (9th Cir. 1983), cert. denied     U.S.     (May 14, 1983). Petitioners bear the burden of *90 proof. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). As a threshold requirement for consideration of evidence of the price at which shares could be sold outside the usual market, it must be shown that actual sales on the market, at or near the valuation date, are not representative of the value of the stock held because of the disproportion between the volume of market sales and the block of stock to be valued. Estate of Van Horne v. Commissioner,supra.The taxpayers must affirmatively show that the block is so big in comparison with the amounts of the stock which have been traded in on the exchange where it is listed that it could not be sold on such market at its quoted prices within a reasonable time by skilled brokers following prudent practices for liquidation. Helvering v. Maytag,125 F.2d 55 (8th Cir. 1942); Mott v. Commissioner,139 F.2d 317 (6th Cir. 1943); Graff v. Munford,150 F.2d 825 (2d Cir. 1945). In valuing a block of stock, we are not required to assume that the entire block was dumped on the market at one time on the valuation date. Rather, the inquiry *91 must be directed to the effect upon the market based on the assumption that the block was being fed out into the market during a reasonable period of time. Estate of Van Horne v. Commissioner,supra,78 T.C. at 742. What is a reasonable period of time depends on all the facts and circumstances. In Bankers Trust Co. v. United States, the Court of Claims made the following statement: While a large block of shares dumped on the market at one moment will ordinarily depress the market price for a time, Seas Shipping Co. v. Commissioner,supra, 371 F.2d at 530, the courts which have considered the blockage issue have concluded that the problem should be treated in terms of whether the market could have absorbed the shares within a reasonable period of time. Richardson v. Commissioner,151 F.2d 102 (C.A. 2, 1945), cert. denied 326 U.S. 66 S. Ct. 490, 90 L. Ed. 485 (1946); White Farm Equipment Co.,supra, 61 T.C. at 215. In those cases in which either a blockage discount has been allowed or the market price disregarded entirely because too large a block was involved, *92 the number of shares being valued was very much greater than the total shares traded in a year. See, e.g., Amerada Hess Corp.,supra, 517 F.2d at 89, 91 (665,000 shares being valued; 440,000 traded during entire year); Moore-McCormack Lines, Inc.,supra, 44 T.C. at 760 (300,000 shares being valued; 166,000 traded during entire year). Bankers Trust Co. v. United States,518 F.2d 1210, 1221-1222 (Ct. Cl. 1975), cert. denied 424 U.S. 966 (1976). [40]
Applying the above-mentioned case to the facts of this case, we are persuaded that respondent must prevail on this issue. A total of 682,500 and 756,200 shares of Baldor stock were traded in 1978 and 1979, respectively. (The *93 number of shares traded during 1979 is reduced to 746,796 if the 15,404 shares sold by the Trust is not taken into account.) Even assuming, arguendo, that for purposes of section 2032 we only have two blocks of stock consisting of 19,910 and 9,540 shares (to be valued at December 20, 1978, and April 10, 1979, respectively), the number of shares here involved is far below the total number of shares traded in the respective years, and is even less than the total shares traded in the respective months and weeks involved, as our findings of fact show. The Trust's sale of 11,900 shares of Baldor stock during the 5-1/2 week period between January 31, 1979, and March 9, 1979, showed that a large block could be sold in smaller units over a reasonable period of time without depressing the market. Petitioners have failed to favor us with any evidence relating to the condition of the corporation which was the issuer of the stock in question. We are not advised as to its worth, its present, past or prospective earnings or even the number of shares outstanding. In short, this record leaves us with only the volume of shares traded and the quoted bid and asked prices upon which to *94 make our determination of the value of the stock in controversy. We do have the conclusory opinion of petitioners' witness, a stockbroker, that a blockage discount of 1 to 1-1/2 points was appropriate for a block of 19,910 shares; and that a block of 9,540 also required a discount of 1 to 1-1/2 points. However, we cannot give much weight to that opinion inasmuch as it is based upon an incorrect definition of blockage, viz., that the shares in question are to be valued as all dumped on the market at the same time. Petitioners have failed to sustain their burden of proof. As was stated in Estate of McKitterick,42 B.T.A. 130, 137 (1940): Failure of the record to disclose that the market was so inactive on or about the critical date [valuation date] that it would have been impossible to dispose of the stock * * * in a reasonably short period of time thereafter, prevents the application of the so-called blockage theory. * * * Upon the record before us, we conclude that the fair market value of the Baldor shares of stock was $25.1875 on December 20, 1978, and $30.875 on April 10, 1979. In view of our holding that petitioners are not entitled to *95 a blockage discount in valuing the shares of Baldor stock, we find it unnecessary to determine whether section 2032 requires a transactional approach. On this issue we hold for respondent. III.
The accrued interest issue
The third issue for resolution is whether the valuation of three certificates of deposit should include $56.28 of interest accrued thereon. Section 2031 provides that the value of the gross estate of the decedent is determined by including the value of all property at the relevant valuation date. Section 20.2031-4, Estate Tax Regs., provides: The fair market value of notes, secured or unsecured, is presumed to be the amount of unpaid principal, plus interest accrued to the date of death, unless the executor establishes that the value is lower or that the notes are worthless. * * * In Jeschke v. United States,     F.Supp.     (D. Kan. 1984), 53 AFTR 2d 84-1644, 84-1 USTC par. 13,562 (appeal pending, 10th Cir. October 26, 1984), the District Court held that the interest accrued was includable on the Federal estate tax return under sections 2031, 2033, and 2040. At the time of his death, Emil J. Jeschke owned *96 334 certificates of deposit in the face amount of $460,000.00. Each certificate was issued jointly in the name of the decedent, one of his children, his grandchildren, his great-grandchildren, or his wife. The accrued interest on these certificates of deposit was not reported on Form 706. In rejecting the taxpayer's argument that accrued interest should not be included in the gross estate since the estate had no right to receive it, the District Court stated: Rev. Rul. 79-340, 1979-2 C.B. [320] is particularly instructive on this issue. This ruling dealt with the value of certificates of deposit for estate tax purposes, when the certificates of deposit were redeemable before maturity without penalty upon the death of the owner. This is exactly the situation we have here. Value, according to the ruling, includes the value of the accrued interest to the date of death. This is so, because the certificates of deposit are worth no less than the most valuable right inherent in their ownership, and because these certificates may be redeemed at death without forfeiture of interest, their value includes the par value plus accrued interest to date of death. Revenue *97 rulings do not have the force of law, but they are official interpretations by the Service and should be given weight. Macey's Jewelry Corp. v. United States,387 F.2d 70, 72 (5th Cir. 1967). We have found that the value of the certificates includes the interest accrued. On this issue we hold for respondent. IV.
The real estate valuation issue
The final issue for resolution is the fair market value of 320 acres of grazing land located in Fergus County, Montana, on April 10, 1979, the end of the six-month alternate valuation period. Fair market value is a question of fact to be resolved from a consideration and weighing of all the relevant evidence in the record. Kaplan v. Commissioner,43 T.C. 663 (1965). Section 20.2031-1(b), Estate Tax Regs., provides that the value of every item in the gross estate is the fair market value, defined as follows: The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. The fair market value of a particular item *98 of property includible in the decedent's gross estate is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the price of the item in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate. Respondent determined, in his statutory notice of deficiency, that the fair market value of the real estate was $22,400.00 ($22,400 / 320 = $70.00 an acre). The deficiency determinations of the statutory notice of deficiency carry with them a presumption of correctness. Welch v. Helvering,supra; Rule 142(a). Petitioner bears the burden of overcoming this presumption. Respondent relies on this presumption of correctness in asserting that the fair market value of the property is $22,400. Petitioners submitted evidence, through an appraiser whom we consider qualified, sufficient to overcome the presumption of correctness attached to the determination in respondent's statutory notice of deficiency. The burden of going forward then shifted to respondent. Respondent's "evidence" regarding the fair market *99 value of the land in issue is limited to the following notation on page two of the explanation of items accompanying the statutory notice of deficiency: It is determined that the fair market value at the alternate valuation date, of the property shown on Schedule A was $22,400.00 instead of $16,000 reported on the estate tax return. Therefore, the taxable estate is increased $6,400. Respondent did not introduce the report of an appraiser or the testimony of any witness in support of the higher valuation figure. [41]
On this issue we hold for petitioners. *100 To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954, as in effect in the years in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. This subtotal represents sale transactions during the six-month alternate valuation period. ↩
3. This subtotal represents sale transactions after the six-month alternate valuation period.↩
4. The parties agree as to the valuation date, but not as to the correct value. ↩
5. The parties agree as to both the valuation dates and values. ↩
6. The parties disagree both as to the correct valuation date and values. ↩
7. The parties agree as to the valuation date, but not as to the correct value.↩
8. 2/20/1978 was a holiday. No shares were traded on that date. ↩
9. 3/24/1978 was a holiday. No shares were traded on that date. ↩
10. 5/29/1978 was a holiday. No shares were traded on that date. ↩
11. 9/4/1978 was a holiday. No shares were traded on that date. ↩
12. 11/23/1978 was a holiday. No shares were traded on that date.↩
13. 2/19/1979 was a holiday. No shares were traded on that date. ↩
14. 4/13/1979 was a holiday. No shares were traded on that date. ↩
15. 5/28/1979 was a holiday. No shares were traded on that date. ↩
16. 7/4/1979 was a holiday. No shares were traded on that date. ↩
17. 9/3/1979 was a holiday. No shares were traded on that date. ↩
18. 11/22/1979 was a holiday. No shares were traded on that date.↩
19. On July 6, 1978, Baldor stock split two-for-one. ↩
20. A total of 1,700 shares of Baldor stock were sold by the Trust during this month. ↩
21. The Trust sold 7,800 shares of Baldor stock during this month. ↩
22. Sales of Baldor stock by the Trust totaled 2,400 shares during this month. ↩
23. A total of 2,500 shares of Baldor stock were sold by the Trust during this month. ↩
24. The Trust sold 1,004 shares of Baldor stock during this month. ↩
25. On September 24, 1979, Baldor stock split three-for-two. ↩
26. A total of 15,404 shares of Baldor stock were sold by the Trust during the year 1979; 11,900 of these 15,404 shares were sold during the 5 1/2 week period between January 31, 1979, and March 9, 1979.↩
27. The actual computation is as follows: 25 3/4 (high) + 24 5/8 (low) = 50.375 / 2 = 25.1875. ↩
28. The actual computation is as follows: 31 (high) + 30 3/4 (low) = 61.750 / 2 = 30.875.↩
29. This figure is the mean between the highest and lowest selling prices on October 30, 1978, (23 1/4 (high) + 20 3/8 (low) = 43.625 / 2 = 21.8125), less a 2.5 point discount for blockage (21,8125 - 2.5 = 19.3125). ↩
30. This figure is the mean between the highest and lowest selling prices on April 10, 1979, (31 (high) + 30 3/4 (low) = 61.75 / 2 = 30.875), less a 2.5 point discount for blockage (30.875 - 2.5 = 28.375). The 1,236 previously gifted shares that were not disposed of by the donee during the alternate valuation period were not included in the gross estate. Petitioners have stipulated that these shares of stock should have been included in the gross estate, but contend that a 2.5 point blockage discount is appropriate in valuing the shares. Thus, a total of 9,540 shares are to be valued as of April 10, 1979.↩
31. Respondent further determined that the 1,236 shares of previously gifted stock were to be included in the gross estate and valued as of April 10, 1979, at $30.875 per share, for a total of $38,161.50. Respondent accordingly increased the taxable estate by $38,161.50.↩
32. Generally, all property interests includable in the gross estate are valued on the date of the decedent's death. Sec. 2031(a).↩
33. There was no order or decree of distribution.↩
34. Ordinarily, the legal title to the trust property does not vest automatically in the persons beneficially entitled on termination of the trust, but remains in the trustee until he makes a conveyance or distribution of it. 4 Scott on Trusts,↩ sec. 345 (3d ed. 1967).
35. The Missouri Uniform Commercial Code was adopted at the 1963 Regular Session of the General Assembly, and became effective on July 1, 1965, applicable to transactions entered into and events occurring after July 1, 1965. The 1977 amendments to the Uniform Commercial Code have not been adopted.↩
36. Sec. 400.8-401, Mo. Ann. Stat. (Vernon 1965), provides in pertinent part: 400.8-401 Duty of issuer to register transfer (1) Where a security in registered form is presented to the issuer with a request to register transfer, the issuer is under a duty to register the transfer as requested if * * * (d) any applicable law relating to the collection of taxes has been complied with; and * * * We find the requirement under Missouri law that an inheritance tax waiver be submitted in order for the shares of stock to be transferred by the stock transfer agent by a corporation not to be a technicality of state law. Petitioners do not argue otherwise. Cf. Estate of Prell v. Commissioner,48 T.C. 67↩ (1967).
37. Petitioners argue that the stockbroker was acting as the individual agent of all of the remaindermen, based on the fact that all of the remaindermen maintained individual accounts at Newhard. On this record, it is clear that Newhard was acting as the agent of the successor trustee, not the remaindermen, in effecting the stock transfer.↩
38. Petitioners argue that the "[t]rustee should not be compelled to merely place the stock in the stream of commerce for eventual transfer at the whim and convenience of a stock transfer clerk in a large stock transfer institution with the date of transfer to be determined by such variables as the illness of employees on a particular day or shifts in mood as to work habits." This contention is without merit. The delays criticized by petitioners are those of the executor-successor trustee, and not of Newhard or the stock transfer agent.↩
39. Compare Richardson v. Commissioner,T.C. Memo. 1984-595. In Richardson, taxpayer, the beneficial owner of 1,442 shares of Babcock & Wilcox stock held under a living trust with the First Trust Company of Montana (Trust Company), sent a letter dated August 11, 1977, to the Trust Company withdrawing the stock from the living trust and requesting that the stock be delivered to the First National Bank & Trust Company of Helena, Montana (Bank), which was instructed as to the disposition of such stock by letter sent on the same day. The stock was donated to eight different charities. United Technologies made a tender offer to the shareholders of Babcock & Wilcox of $48 per share. A new tender offer at a price of $55 per share was made by J. Ray McDermott & Co., followed by a final offer of $62.50 per share, in response to which the 1,442 shares of Babcock & Wilcox were delivered to J. Ray McDermott on August 22, 1977, by the Bank. The transfer of the tendered shares on the books of Babcock & Wilcox, and issuance of new stock certificates, took place on September 16, 1977. This Court held that the gift of the stock to the eight charities was completed upon the Bank's tender of the stock to J. Ray McDermott & Co. Londen v. Commissioner,45 T.C. 106 (1965), distinguished. The facts of this case are clearly distinguishable. Furthermore, in Richardson,↩ taxpayer's letter to the Trust Company, followed by the Bank's actions in furtherance of taxpayer's directives created an irrevocable trust under Montana law. No such situation is present here.
40. See Wheeler v. Commissioner,T.C. Memo. 1978-208. Wheeler↩ involved the valuation of 32,029 shares of restricted, unregistered stock. The average trading volume during the first five months of the valuation year was in excess of 10,000 shares per month. This Court held that a blockage discount was inappropriate in view of the fact that the market was able to absorb the shares within a reasonable period of time.
41. Respondent cites Whitt v. Commissioner,T.C. Memo. 1983-262, in support of his position. Whitt↩ involved the valuation of 343 acres of land. The sole evidence introduced by the taxpayers was a deed by which five of the heirs sold their one-sixth interest in the land to the sixth heir. The Court held that the deed was relevant evidence as to the fact that the land had been sold, not to the effect that the sale was freely negotiated. This was deemed insufficient to contradict the testimony of the expert and his appraisal, introduced by respondent. The facts of this case are clearly distinguishable.